Commonwealth vs. Wayne Blyth Healy.

Suffolk. November 5, 2002. - February 13, 2003.

Present: Marshall, C.J., Greaney, Spina, Cowin, Sosman, & Cordy, JJ.

*Waiver. Constitutional Law,* Waiver of constitutional rights. *Evidence,* Exculpatory, Failure to produce evidence. *Practice, Criminal,* Conduct of prosecutor. *Due Process of Law,* Prosecution's duty to obtain evidence.

A criminal defendant did not waive a claim that the Commonwealth failed to produce certain exculpatory evidence (a postmortem report), where the fact that it would have been possible for defense counsel to obtain the report from the hospital, if he had known of its existence, did not operate as a waiver of the defendant's constitutional claim that the prosecutor had agreed to turn over all witness statements, scientific reports, and exculpatory evidence and failed to do so. [677-678]

This court concluded, on review of the entire transcript at a murder trial, that the defendant was not entitled to a new trial on the basis of the defendant's contention that the prosecution had failed to disclose exculpatory material (a postmortem report) in violation of the defendant's Federal and State constitutional rights where, even if the prosecution had supplied the report to the defendant in a timely fashion, the report or available evidence disclosed by it would not have influenced the jury. [678-685]

Indictment found and returned in the Superior Court Department on September 11, 1980.

Following review by this court, 393 Mass. 367 (1984), a motion for a new trial, filed on April 11, 1997, and amended on July 30, 1999, was heard by *Judd J. Carhart,* J.

A request for leave to appeal was heard by *Cordy,* J.

*Judy Zeprun Kalman,* Special Assistant District Attorney, for the Commonwealth.

*Geoffrey C. Packard,* Committee for Public Counsel Services (*M. Page Kelley,* Committee for Public Counsel Services, with him) for the defendant.

Sosman, J. In 1981, the defendant was convicted of murder in the first degree. We affirmed the conviction and the denial of the defendant's first motion for a new trial, and we denied his

second motion for a new trial. *Commonwealth* v. *Healy*, 393 Mass. 367 (1984). The defendant has since filed a third motion for a new trial, based in part on the allegation that the prosecution withheld exculpatory and material evidence in violation of his Federal and State constitutional rights.[1] See *Commonwealth* v. *Gallarelli*, 399 Mass. 17, 19 (1987), and cases cited. After an evidentiary hearing, the motion judge[2] denied the motion for a new trial. A single justice of this court allowed the defendant's petition for leave to appeal. G. L. c. 278, § 33E. We now affirm the denial of the defendant's motion for a new trial.

1. *Background.* a. *Facts presented at trial.* The facts of this case are set out in full in *Commonwealth* v. *Healy, supra* at 369-372. As background to the present appeal, we set forth those facts pertinent to the claimed failure to disclose exculpatory evidence. The twenty-nine year old victim lived with his girl friend in an apartment in Holyoke. Police were summoned to the apartment on a report of hearing the victim screaming for help at approximately 1 or 1:30 A.M. on August 8, 1980. The police found the victim's body on his bed. He had been stabbed fourteen times in the chest, twice in the neck, and once on his right thigh. The pathologist who conducted the autopsy opined, based on the location and angle of the wounds, that the perpetrator had been kneeling on the bed to the right of the victim at the time the wounds were inflicted. The victim's body was naked, except for a towel wrapped around his neck and a pair of jeans pulled halfway down his legs. There was no underwear on the body. The victim's hands were bound with socks tied together, and a gag of socks was tied around his mouth. On the floor at the foot of the bed, police found a pair of boots, also tied together with socks. On top of a dresser in the bedroom, approximately four to five feet from the body, police found a pair of undershorts. Testing of the shorts revealed the presence of semen consistent with the victim's blood group.

There was some evidence concerning recent changes in the

---

[1]The defendant's motion also alleged error in certain jury instructions and ineffective assistance of counsel. The motion judge did not consider those claims because they were waived. The defendant does not press those claims on appeal.

[2]The motion judge had not presided at the defendant's trial. The trial judge was no longer sitting in the Superior Court.

victim's behavior that, although only general in nature, "tended to show that in the week before his death the victim had formed a sexual relationship with someone other than his girl friend." *Commonwealth* v. *Healy, supra* at 378. Then, on the night of the murder, the victim's girl friend had telephoned the apartment and spoken to the victim. In the background, she heard a "very soft" male voice. When the girl friend asked who was there, the victim was evasive, and ultimately told her that it was his downstairs neighbor. The neighbor testified that he had not been there,[3] from which the jury could infer that the victim had lied about the identity of the man who was in his apartment. At the scene, the police found no sign of forced entry into the apartment. The front and back doors were locked, and the victim's dog, a Doberman pinscher, was locked in another room.

Evidence that the defendant committed the crime was entirely circumstantial. After initially telling the police that he had not seen the victim for some months, the defendant acknowledged that he had purchased rum, soda, and ice and taken them to the victim's apartment on the night of the murder. The cash register receipt for those items was found, stained with blood, on the third-floor landing of the front stairs. A knife on the dresser in the bedroom had a mixture of blood, consistent with a mixture of the defendant's blood type and that of the victim. A search of the defendant's apartment uncovered a shirt with a bloodstain, also consistent with a mixture of the victim's and the defendant's blood. The defendant had a cut on his hand, which he claimed had occurred at his home the morning after the murder. However, the physician who treated that cut opined that it had been inflicted some hours earlier than the defendant claimed. Finally, the Commonwealth presented consciousness of guilt evidence, consisting of the defendant's conflicting versions as to when he had last seen the victim, the nature and extent of his encounter with the victim on the night of the murder, his whereabouts later that night, and the time that he had returned

---

[3]At the time, the apartment building was virtually empty, as there had been a major fire the week before. The building had telephone service, but no electricity, and the building had been condemned. The victim had remained in his apartment with his dog to guard against looting, but the occupants of most other apartments had moved out. The victim's girl friend had lived in the victim's apartment, but she was staying elsewhere in the wake of the fire.

home. In particular, the Commonwealth stressed the fact that the defendant had asked his partner to lie to the police concerning the time the defendant had returned home. The defendant claimed that his reluctance to tell the police where he had been on the night of the murder was due to the fact that he had gone to two "gay" bars after leaving the victim's apartment and did not want to disclose to the police that he was homosexual. The Commonwealth countered that explanation with evidence that the defendant had led an openly "gay" lifestyle.

b. *Third motion for a new trial.* In 1994, the defendant filed a motion for the release of certain exhibits for the purpose of conducting DNA testing. The motion was allowed in part, and the items were made available to the defendant's chosen laboratory. A motion for a new trial was filed in 1997, along with a motion for further discovery. In the course of gathering materials to investigate potential grounds for a new trial, defense counsel[4] became aware of three documents prepared by Dr. H. Paul Wakefield, a pathologist at Holyoke Hospital, who had performed the autopsy of the victim at the direction of the medical examiner. Trial counsel had requested, and by way of a pretrial conference report the Commonwealth was required to provide, exculpatory material, "material and relevant physical evidence and documents," "reports of mental or physical examinations and of scientific tests," and witness statements. New counsel alleged that, while one of Dr. Wakefield's reports had been provided in discovery, the other two reports had not been provided. In 1999, counsel filed an "amended" motion for a new trial to "super[s]ede his original motion in all respects." The amended motion alleged prosecutorial misconduct in failing to provide exculpatory evidence, along with other claimed errors not relevant to the present appeal.[5] See note 1, *supra.*

The reports from Dr. Wakefield, which form the basis of the defendant's motion for a new trial, consist of the following. Dr. Wakefield authored a four-page report dictated shortly after the August 8, 1980, autopsy and bearing the heading "Holyoke

---

[4]New counsel had been assigned to represent the defendant in connection with his third motion for a new trial.

[5]The motion did not rely on (or make reference to) the results of the defendant's expert's forensic testing.

Hospital Pathology Department Post-Mortem Examination"
(postmortem report). In the first paragraph of the postmortem
report, Dr. Wakefield indicated that the victim's genitalia were
"examined closely" and that "no evidence of marks of recent
origin" were identified. The rectum was "similarly viewed
revealing no abnormal findings on the external surface." The
postmortem report went on to note that "[s]mears [were] made
by use of a swab from both the mouth as well as rectum to be
examined under the microscope." The next document at issue
was a handwritten note (note) of Dr. Wakefield dated August
10, 1980, two days after the autopsy, reflecting the results of the
microscopic examination of the oral and rectal smears: "Smears
made from mouth and rectum fail to reveal spermatozoa
present." The final document was a two-page report dated
November 28, 1980, entitled "Autopsy Report," that included a
subheading of "Final Diagnosis" (final diagnosis). The final
diagnosis included the cause of death and gross anatomical
description, but did not make any reference to examination of
the victim's rectum and genitalia, the taking of any swabs or
smears, or the results of any examination of swabs or smears.

In support of the amended motion for a new trial, an affidavit
of trial counsel was submitted alleging that in preparation for
trial he had received and reviewed the final diagnosis, but that
he had not seen the postmortem report or the note and was not
aware of the taking of any swabs. Following an evidentiary
hearing on the issue of what items had been provided in
discovery, the motion judge found that the hospital had
forwarded both the postmortem report and the final diagnosis to
the district attorney's office. However, the district attorney's of-
fice gave the defendant's trial counsel only the final diagnosis,
not the postmortem report.[6] The judge concluded that this failure
on the part of the prosecutor was the product of inadvertence,

---

[6]The Commonwealth contends that this finding is clearly erroneous, and
points to compelling evidence that it in fact turned over the postmortem
report. The determination of what was provided to defense counsel was
complicated by the fact that trial counsel's original file had been destroyed in
a basement flood. For reasons that are unclear, neither side obtained the file
from the attorney who had represented the defendant in his original appeal
and first two motions for a new trial, which presumably would have contained
a copy of trial counsel's entire file. In the absence of either counsel's files, the

not wilful misconduct. With respect to the note, the motion judge was unable to determine whether the hospital or Dr. Wakefield had ever turned the note over to the district attorney's office, and hence did not find any form of prosecutorial misconduct with respect to the note. Notwithstanding the prosecutor's failure to provide defense counsel with the postmortem report, the motion judge held that the defendant did not meet his burden of showing that the postmortem report was exculpatory or material. He therefore denied the motion for a new trial.

2. *Discussion.*

a. *Waiver.* The Commonwealth argues that the defendant's claim of failure to produce exculpatory evidence should not be reviewed because it was waived. The theory of waiver is, premised on the fact that the defendant's previous attorneys could have subpoenaed the hospital's records and discovered the documents in time to use them at trial or as part of either of his prior motions for a new trial. The fact that it would have been possible for defense counsel to obtain the documents from the hospital, if he had known of their existence, does not operate as a waiver of his constitutional claim that the prosecutor failed to turn over exculpatory information.

The defendant's claim of prosecutorial misconduct was not "generally known and available at the time of trial or appeal." *Commonwealth* v. *Valliere*, 437 Mass. 366, 370 (2002), quoting *Commonwealth* v. *Pisa*, 384 Mass. 362, 365-366 (1981). The defendant had no reason to believe that the pathologist had generated more than one report concerning the autopsy of the victim.[7] At no time was defense counsel aware, nor did he have any reason to suspect, that there were additional materials pertaining to the autopsy that he did not have. The prosecutor

---

motion judge had to make his determination based on the testimony of attorneys concerning what they had and had not seen or done during discovery and trial some twenty years earlier. We do not disturb the factual findings of the motion judge unless they are clearly erroneous, and we must defer to his assessment of witness credibility. Notwithstanding the strength of the Commonwealth's evidence and argument concerning its production of the postmortem report, we must therefore accept the motion judge's contrary finding on this point.

[7] Indeed, one of the reasons that the judge found the prosecutor's failure to produce the postmortem report was inadvertent was that the prosecutor would understandably make the same assumption, i.e., that having produced a report

agreed as part of the pretrial conference report to turn over all witness statements, scientific reports, and exculpatory evidence. "[W]here a prosecutor fails to disclose evidence in his control which is also within the scope of a pretrial agreement having the force of a court order, such failure amounts to a representation on which the defendant is entitled to rely, that no such evidence exists." *Commonwealth* v. *Gallarelli*, 399 Mass. 17, 23-24 n.7 (1987). Justifiable reliance on the prosecutor's fulfilment of discovery obligations will not result in waiver of a claim of violation of those obligations merely because the items the prosecutor was obligated to produce could have been obtained from some other source. We thus conclude that there was no waiver of the claim now being made.

b. *Nondisclosure of alleged exculpatory evidence.* The defendant contends that he is entitled to a new trial because the prosecution failed to disclose exculpatory material in violation of his Federal and State constitutional rights. See *Commonwealth* v. *Ellison*, 376 Mass. 1, 21 (1978) ("the rule of *Brady* v. *Maryland*, 373 U.S. 83, 87 [1963] . . . [is] that suppression by the prosecution of requested material evidence which is favorable to the accused is a denial of due process" [citations omitted]). "In instances where, as here, a judge hearing a motion for new trial was not the trial judge, 'we regard ourselves in as good a position as the motion judge to assess the trial record.' " *Commonwealth* v. *Salvati*, 420 Mass. 499, 500 (1995), quoting *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986). "[W]hen a new trial claim is constitutionally based, as in the instant case[], 'this court will exercise its own judgment on the ultimate factual as well as legal conclusions.' " *Commonwealth* v. *Salvati*, *supra*, quoting *Commonwealth* v. *Tucceri*, 412 Mass. 401, 409 (1992).

Accepting the motion judge's finding that the postmortem report was not produced (see note 6, *supra*), the sole issue before us is whether the evidence withheld by the prosecution would qualify as exculpatory and material such that the failure

---

of the autopsy, the prosecutor would reasonably conclude that there was no need to review the file for another report on the same subject.

to produce it would constitute a violation of due process.[8] See *United States* v. *Agurs*, 427 U.S. 97, 106 (1976); *Brady* v. *Maryland, supra* at 87. "The *Brady* obligation comprehends evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." *Commonwealth* v. *Ellison, supra* at 22. To prevail on a claim that the prosecution failed to disclose exculpatory evidence, the defendant must first prove that the evidence was, in fact, exculpatory. See *Commonwealth* v. *Wilson*, 381 Mass. 90, 107 (1980). See also *Commonwealth* v. *Schand*, 420 Mass. 783, 787 (1995), citing *Commonwealth* v. *Adrey*, 376 Mass. 747, 753 (1978), and cases cited ("defendant must establish that the evidence existed, that it tended to exculpate him, and that the prosecution failed to deliver the information"). " '[E]xculpatory' in this context is not a narrow term connoting alibi or other complete proof of innocence, *Commonwealth* v. *Ellison*, [*supra* at 22 n.9], but rather comprehends all evidence 'which tends to "negate the guilt of the accused" . . . or, stated affirmatively, "supporting the innocence of the defendant." ' *Commonwealth* v. *Pisa*, 372 Mass. 590, 595, cert. denied, 434 U.S. 869 (1977)." *Commonwealth* v. *St. Germain*, 381 Mass. 256, 261 n.6 (1980).

Where, as here, the defendant specifically requested the

---

[8]The prosecutor's obligation to disclose alleged exculpatory evidence extends only to those things in his possession or subject to his control. See *Commonwealth* v. *Salvati*, 420 Mass. 499, 502 (1995); *Commonwealth* v. *Daye*, 411 Mass. 719, 734 (1992). The defendant did not establish, and the motion judge did not find, that the note was within the prosecutor's possession or control. However, had the postmortem report been turned over to defense counsel, it would have alerted him to the fact that oral and rectal swabs had been taken for further examination, and competent counsel would presumably have followed up on that information and thereby obtained the test results that are reflected in the note. Thus, although the Commonwealth's obligation to turn over documents did not extend to the note, the failure to produce the postmortem report effectively deprived the defendant of access to the note. We therefore also examine whether the note would qualify as exculpatory and material. See *Commonwealth* v. *Daye, supra* at 729 (court considers whether withheld report "or available evidence disclosed by it" would have influenced jury).

evidence that was not disclosed,[9] "a standard of prejudice more favorable to the defendant is justified." *Commonwealth* v. *Tucceri, supra* at 407. In such circumstances, "a defendant need only demonstrate that a substantial basis exists for claiming prejudice from the nondisclosure." *Id.* at 412. However, despite this more favorable standard, the burden of establishing the requisite "substantial basis" for a claim of prejudice rests with the defendant. See *Commonwealth* v. *Schand, supra* at 788 n.1; *Commonwealth* v. *Tucceri, supra* at 404 n.2, and cases cited. In cases involving a specific request for evidence, we look to the record to determine "whether we can be confident that, even if the prosecution had supplied the report to the defendant[] in timely fashion, the report or available evidence disclosed by it would not have influenced the jury." *Commonwealth* v. *Daye*, 411 Mass. 719, 729 (1992).

The defendant argues that the postmortem report and note showed that the pathologist searched for, and could not find, signs of recent sexual activity involving the victim. The defendant posits that this evidence was crucial because it would have undermined the Commonwealth's theory that the murder was the product of a homosexual encounter gone awry. He also contends that the fact that the police instructed the pathologist to conduct a microscopic search for signs of homosexual activity shows that the police were biased, and had "rush[ed] to judgment," and that he could have used this evidence to cast doubt on the integrity of the investigation. We are unpersuaded by the defendant's characterization of how this evidence would potentially have affected the trial.

The defendant overstates the factual import of the postmortem report and note when he argues that they would have contradicted the theory that the murder was connected with some form of sexual encounter. The absence of spermatozoa in the victim's rectum or mouth means only that any sexual activity that occurred had not resulted in ejaculation in or around those

---

[9]The request for "reports of mental or physical examinations and of scientific tests" qualifies as a "specific request" for the postmortem report. See *Commonwealth* v. *Gallarelli*, 399 Mass. 17, 21-22 (1987) (pretrial agreement for production of "scientific reports" was "specific request" covering laboratory report of test performed on defendant's knife).

specific areas.[10] Similarly, the absence of any "marks" or "abnormal findings" on the victim's genitals and rectum means only that any sexual activity that occurred had not been sufficiently forceful or forcible to have inflicted visible injury.[11] There is a wide range of sexual activity, up to and including many forms of sexual assault, that leaves neither sperm nor signs of injury to sexual organs. The Commonwealth presented no evidence, and did not make any suggestion to the jury, concerning precisely what forms of sexual activity may have taken place, or at what point in that sexual activity the encounter had turned violent, and no such precision with respect to the nature of the posited sexual encounter was even remotely necessary to the Commonwealth's case. Thus, that Dr. Wakefield's examination had arguably eliminated a few specific types of sexual activity did not, in any sense, undermine the evidence suggesting that the stabbing had occurred during the course of some form of sexual encounter. We agree with the motion judge's conclusion that the postmortem report and note "would not have provided any more material information or raised any more doubts about the sexual nature of the crime."

Moreover, the theory that the murder had occurred during a sexual encounter was of significance to the case in only a narrow, limited sense. The Commonwealth did not even reference this theory in closing argument, except to counter one point raised during defense counsel's closing argument. In his closing argument, defense counsel had argued to the jury that, given the number of stab wounds and the extremely bloody crime scene, the perpetrator's clothes would have had extensive bloodstains. By comparison, although blood of the victim's type was found on the defendant's shirt, the amount was quite small. The prosecutor's closing argument responded to this defense argu-

[10]Four to five feet from the victim's body was a pair of undershorts stained with semen. As the court noted in response to the defendant's earlier argument that that semen-stained underwear should not have been admitted, that evidence was "especially relevant." *Commonwealth* v. *Healy*, 393 Mass. 367, 378 (1984).

[11]At the evidentiary hearing, Dr. Wakefield explained that his examination of the victim's rectum revealed "no distention and . . . no redness or tears," and that examination of the victim's genitalia uncovered "no evidence that the penis was abraded or particularly red."

ment by pointing out the distinct possibility that the perpetrator had no clothes on at the time of the stabbing:

> "This man was stabbed seventeen times. Blood was going all over the place. Would it be logical, Ladies and Gentlemen, that the person who stabbed him could be covered with blood and would it necessarily follow, Ladies and Gentlemen, that that person be wearing any clothing? Now, you've seen the photographs, Ladies and Gentlemen. The one I just showed you, what kind of activity do you think was going on in that bedroom? Ask yourselves that. Don't leave your common sense at home. Does it necessarily follow, Ladies and Gentlemen, that that person who was with [the victim] had any clothes on at all? Could you infer, Ladies and Gentlemen, that he washed the blood off and walked through the bedrooms and walked into the kitchen and washed that blood off? [The victim] was naked except for pants below his knees. Do you think you can infer that this person was necessarily clothed that was with him in that bedroom?"

As indicated above, the Commonwealth's theory did not rely on evidence of any specific form of sexual activity, nor did the Commonwealth suggest any motive for the stabbing of the victim. The only way in which the sexual nature of the encounter had any significance was to establish the reasonable possibility that the perpetrator may have been naked, so that the jury would not attach undue importance to the fact that the defendant's shirt was bloodstained in only one small area. The absence of sperm in the victim's mouth or rectum, and the absence of signs of physical injury to his genitals or rectum, would not have detracted from the Commonwealth's suggestion that the perpetrator may well have been unclothed at the time of the stabbing.

The defendant correctly points out that there was extensive reference at trial to the defendant's homosexuality. However, that issue was raised by the defendant's own explanation as to why he had initially lied to the police about his whereabouts on the night of the murder and why he had asked his partner to concoct a false alibi. The defendant claimed that he had been reluctant to tell the police his true whereabouts because he had been at two "gay" bars. To illustrate the implausibility of this

proffered explanation, the Commonwealth introduced evidence that the defendant was openly homosexual, with no need or desire to conceal his sexual orientation. This evidence concerning the defendant's homosexuality had nothing to do with any theory how or why the murder had been committed, but was directed instead at the interpretation to be placed on what the Commonwealth had proffered as consciousness of guilt evidence.[12]

As illustration of the minimal significance that the issue of the hypothesized sexual encounter played at trial, defense counsel's lengthy closing argument nowhere mentioned the fact that the Commonwealth had presented no physical evidence of any such sexual encounter. While the defendant now protests that he would have made great use of the postmortem report and note had he had them at trial, he ignores the fact that, on the evidence presented at trial, he could have but did not register *any* criticism of the lack of evidence on this issue. We agree that, in the absence of the postmortem report and note, defense counsel would reasonably have refrained from cross-examining Dr. Wakefield on the absence of such evidence (for fear of eliciting some unforeseen harmful evidence). However, once the evidence was closed, defense counsel could have vehemently — and safely — argued to the jury that the prosecution had not presented any physical evidence from the victim's body to corroborate that sexual activity had preceded the murder. The Commonwealth had not presented any evidence of seminal fluid or sperm on the victim, or any evidence of forcible penetration. If, as the defendant now contends, it was crucial to his defense that he cast doubt on the theory that there had been a sexual encounter, it is puzzling that he did nothing whatsoever to cast doubt on that theory with the evidence (or lack thereof) that was presented at trial. We are not confronted with a situation where an argument made at trial could have been made more forcefully if defense counsel had had the withheld evidence. Cf. *Commonwealth* v. *Tucceri*, 412 Mass. 401, 410 (1992) (counsel

---

[12]Similarly, as part of its impeachment of the defendant's partner (who had given testimony favorable to the defendant), the Commonwealth introduced evidence of their long-standing intimate relationship for the purpose of demonstrating bias.

argued at trial that police failure to produce photographs warranted inference favorable to defendant; actual frontal photograph, when later discovered, provided "irrefutable demonstration on the same subject"). Here, there was no such argument made at trial.

The only difference between the argument that could have been made at trial and the argument that could have been made with the postmortem report and note was that the Commonwealth had looked for certain signs of sexual activity and not found those particular signs. If the absence of that particular evidence related to sexual activity had, in fact, been important to the defense, that absence would surely have been pointed out to the jury. Instead, the defendant's closing argument did not in any way contest the inference that the attack on the victim had occurred during the course of some unidentified form of sexual activity. What the defendant now proffers as the "more plausible theory" to explain the condition of the victim's body — that he was "set upon by looters," "tied up simply to incapacitate and silence him," and that "he managed to wriggle free of his boots (possibly dislodging his pants) and was stabbed to prevent his getting away" — is a theory that could have been, but was not, presented to the jury.[13]

As to the defendant's contention that the postmortem report and note would have helped him establish that the police investigation was biased, we reject the suggestion that mere examination and testing of the victim's body for signs of sexual activity somehow suggests police bias. From the condition of the victim at the crime scene — semi-naked, bound, pants pulled down, and genitals exposed — it would be reasonable for the

---

[13]It was presumably not presented for the simple reason that the theory did not comport with other evidence. Aside from the implausibility of the notion that "wriggl[ing] free" of his boots would cause the victim's pants to fall to his knees, the suggestion that the crime was perpetrated by "looters" was contradicted by the evidence of no forced entry, no sign of any rummaging through the victim's belongings, and no missing property. It is also difficult to understand why "looters" would bypass numerous empty apartments and seek to loot the one apartment that was occupied by a man and his Doberman pinscher. The contents of the postmortem report would not have helped the defendant overcome the numerous shortcomings of the now proffered theory that "looters" stabbed the victim.

police to consider and investigate the possibility that the murder had some connection to sexual activity.

Having reviewed the entire trial transcript, we are "confident that, even if the prosecution had supplied the report to the defendant[] in timely fashion, the report or available evidence disclosed by it would not have influenced the jury." *Commonwealth* v. *Daye*, 411 Mass. 719, 729 (1992). As such, we find no error in the judge's denial of the defendant's third motion for a new trial.

> *Order denying motion for a new*
> *trial affirmed.*