COMMONWEALTH vs. KELVIN IGUABITA.

No. 06-P-960.

Essex. February 26, 2007. - June 7, 2007.

Present: PERRETTA, SMITH, & VUONO, JJ.

*Evidence,* Prior misconduct, Exculpatory.

At a criminal trial, the judge did not err in admitting in evidence the testimony
of two witnesses regarding the defendant's bad acts, where the evidence,
which demonstrated a modus operandi on the part of the defendant similar
to that to which the victim testified, was probative of issues such as
whether the victim's claims were based on fantasy, whether the defendant
had the opportunity to commit the alleged acts, and whether the place
where the acts allegedly took place was public; further, the probative value
of the testimony outweighed its prejudicial impact. [299-301]
A Superior Court judge did not err in denying the criminal defendant's motion
for a new trial on the ground of the Commonwealth's failure to disclose al-
legedly exculpatory evidence, where a videotape that had not been disclosed
was not exculpatory and, even if it had been disclosed, would not have
created a reasonable doubt that did not otherwise exist [301-303]; and
where the defendant did not meet his burden of establishing that a substantial
basis existed for claiming prejudice as a result of the nondisclosure of a
certain witness's statements on a tangential point [303-305].

INDICTMENTS found and returned in the Superior Court Depart-
ment on May 22, 2002.

The cases were tried before *Richard E. Welch, III,* J., and a
motion for a new trial, filed on September 5, 2003, was heard by
him.

*Thomas J. Gleason* for the defendant.

*Catherine Langevin Semel,* Assistant District Attorney, for the
Commonwealth.

SMITH, J. Following a jury trial in the Superior Court, the
defendant, Kelvin Iguabita, was convicted of one indictment
charging rape of a child under sixteen, two indictments charging

indecent assault and battery, and one indictment charging unnatural and lascivious acts upon a child under sixteen. The defendant was found not guilty of an indictment charging assault with intent to rape. A fifteen year old girl was the complainant in all of the indictments.

The defendant filed a timely notice of appeal on July 7, 2003, and, on the same date, filed his first motion for a new trial. On July 17, 2003, the trial judge denied the motion. No notice of appeal was filed, and the denial of that motion is not the subject of this appeal.

The defendant filed a second new trial motion on September 5, 2003. After a two-day evidentiary hearing, the trial judge denied the motion and the defendant filed a timely appeal.

On his direct appeal, the defendant claims that the judge committed error in allowing the Commonwealth's motion in limine to admit evidence of certain alleged prior acts of the defendant, and on his appeal from the order denying his second motion for a new trial, the defendant claims that he was entitled to a new trial either because of the Commonwealth's failure to disclose certain exculpatory evidence, or because newly discovered evidence warranted a new trial.

*Facts.* Based on the Commonwealth's evidence, the jury could have found the following facts. In June of 1999, the defendant, a Roman Catholic priest, was assigned as parochial vicar (assistant priest) at the All Saints Parish in Haverhill. In November of 1999, the victim was in her freshman year at a private Catholic high school. She took a job at the All Saints Parish rectory, working from 1:00 P.M. to 5:00 P.M. on Saturday afternoons. Her duties consisted of answering the telephone, answering the door, and performing light secretarial work.

The rectory consisted of four floors. On the first floor, there were offices for the pastor, the bookkeeper's office, the secretary's office, and across from the secretary's office, the defendant's office. There was also a kitchen and dining room on the first floor. There were four doors to the rectory, which were always locked. The victim had her own set of keys to the rectory, and when she worked on Saturday afternoons, she was often the only person present.

All of the incidents alleged in the indictments took place on

different Saturday afternoons during times that the victim was working alone in the rectory. The time span of the incidents ranged from late July to early September of the year 2000.

The victim testified in considerable detail in regard to each of the incidents. When the victim first started working at the rectory, she had little contact with the defendant during her work hours. The victim had been schooled at home from the fourth grade through the eighth grade, and as a result, she was having trouble adjusting to her first year in high school. The victim was highly religious, as were her parents. Therefore, her parents urged the victim to discuss her problems with the defendant and also to seek spiritual advice from him. She followed her parents' advice and started to discuss her problems with the defendant.

One Saturday afternoon in late July of 2000, the victim was working in the rectory. The defendant noticed the victim writing in her diary and asked if she had written about him. He then playfully attempted to grab the diary from her. After he chased the victim into an adjacent room, he approached her from behind and began running his hands up and down her arms. Then, breathing heavily, he placed his hands on the victim's breasts, over her clothes, and kept them there for several seconds. The victim backed away.

A week or two later, while the victim was at her desk in the rectory, the defendant came in, sat behind her, reached under her shirt, and began massaging her back. He then unfastened her bra and reached around to pull it down in front without touching her body, but the victim moved away and readjusted herself.

On August 12, 2000, the victim came to work dressed in a sleeveless, black dress that she intended to wear at a wedding taking place later that day. She told the defendant she did not know how to dance, and he offered to show her. He pulled the victim against his body and she could feel his penis as he moved back and forth against her. He kissed her and placed his hands on her breasts, over her bra, and caressed them. The victim and the defendant later attended the wedding, but not together.[1]

One or two weeks later, the defendant approached the victim

[1]After the trial concluded, the Commonwealth discovered that the investigating officer had in her possession a videotape recording taken at the wedding reception. The fact that it was not given to the defendant before the trial was

in the rectory after she had arrived at work. He was wearing a polo shirt and shorts. He kissed her, inserting his tongue in her mouth, and inserted his finger in her vagina. The defendant also pressed his erect penis against the victim's body, then took her hand and placed it inside his shorts and tried to make her hold his penis. She removed her hand, but he replaced it two or three times. The victim looked at a statue of "Our Lady" on a window sill, and prayed, as this was happening, "Please let this stop."[2]

A week or two later, sometime in September, the defendant approached the victim from behind, lifted her skirt, pulled down her underwear around her thighs, and tried to put his penis in her vagina. As he tightened his grasp on her shoulder and waist, she felt his penis between her buttocks and on the lips of her vagina. He pressed against her, moving around and grunting, but after about a minute said, "You're a little thing," and told her he was not going to "fit." He turned her around and lifted her skirt; he kissed her vagina and inserted his tongue. After this incident, the defendant began to call her "little thing," sometimes even in front of other people.

That incident was the last time the defendant had sexual contact with the victim prior to her sixteenth birthday. Later, he asked her to have sexual intercourse with him and even talked about marrying her.

After she turned sixteen, her parents, after repeated requests from the victim, allowed her to quit her job at the rectory. The victim's older brother died unexpectedly in July, 2001, and the victim had difficulty coping with his death. During counselling sessions to address her difficulty, the victim told her therapist of the defendant's sexual misconduct. The therapist reported the matter to the police who, in turn, contacted the victim.

Through cross-examination of the victim and other Commonwealth witnesses, and the testimony of defense witnesses, the defendant attempted to show that the victim had fantasized the entire matter and that none of the incidents happened. In that regard, the defense offered evidence that the defendant had

---

one of the issues raised in the second motion for a new trial.

[2]Whether there was a statue of "Our Lady" in the rectory at the time of this particular assault became one of the grounds mentioned in the defendant's second motion for a new trial.

alibis for certain dates on which the victim had testified that some of the indecent assaults had taken place. Through cross-examination of the victim and the investigating officer, the defendant also challenged the location of the statue to which the victim testified that she had been praying during one of the incidents. Further, the defense attempted to show that the rectory was a busy place with people coming and going, especially on Saturdays, and that it would be impossible for the assaults to have taken place without being discovered by someone.

1. *The issue on direct appeal — conduct of the defendant with other women.* As part of its case, the judge allowed the Commonwealth's motion in limine to call as witnesses two women who would testify about the defendant's sexual conduct with them in the rectory.[3] The defendant objected at the time of the allowance of the motion and also at the time the witnesses testified.

A young woman, whom we identify as R.R., twenty-seven years old at the time of the trial, testified that she moved to Haverhill in late 1999. In becoming acclimated to her new surroundings, she became involved in activities at All Saints Parish, including teaching religious education classes. She became acquainted with the defendant and she sought him out for spiritual guidance and comfort.

One Sunday afternoon in early 2000, the defendant telephoned her and asked her to come to see him at his office in the rectory. Once there, R.R. and the defendant discussed the subject of dancing. The defendant mentioned Spanish dancing, and he offered to show her that type of dance. He pulled R.R. close to him, in a dancing position, and spoke softly, in a romantic tone. She pulled away, and the defendant pointed to his photograph, which was on a shelf, taken at the time of his ordination. When R.R. turned around to look at it, the defendant put his penis against her "backside." R.R. moved away from the defendant and refused the defendant's request to go to her apartment.

Another incident took place in March, 2001, when the defendant, after inviting R.R. into the rectory, placed his hands

---

[3]The judge excluded any evidence as to acts that occurred between the two women and the defendant at places other than the rectory.

under her shirt and asked her to marry him and have sex with him. She refused and left the rectory.

Another witness, M.H., an older woman, described an encounter that she had with the defendant on January 15, 2001. On that date, M.H. asked to speak to the defendant about a personal problem. He invited her into the rectory. After a short interval, M.H. engaged in consensual sexual conduct with the defendant.

"It is well settled that the prosecution may not introduce evidence of a defendant's prior or subsequent bad acts for the purpose of demonstrating bad character or propensity to commit the crime[s] charged." *Commonwealth* v. *Butler*, 445 Mass. 568, 574 (2005), quoting from *Commonwealth* v. *Barrett*, 418 Mass. 788, 793 (1994). The evidence, however, may be admissible for other relevant probative purposes, *Commonwealth* v. *Cordle*, 404 Mass. 733, 744 (1989), *S.C.*, 412 Mass. 172 (1992), including "to show knowledge, intent, motive, opportunity, or absence of mistake or accident." *Commonwealth* v. *O'Laughlin*, 446 Mass. 188, 208 (2006). "[E]vidence of a sexual assault on a person other than the victim is only admissible if it is connected 'in time, place, or other relevant circumstances to the particular sex offense for which the defendant is being tried.' " *Commonwealth* v. *Hanlon*, 44 Mass. App. Ct. 810, 818 (1998), quoting from *Commonwealth* v. *King*, 387 Mass. 464, 470 (1982). The judge must also find that the probative value of the evidence in question "is [not] outweighed by a risk of undue prejudice to the defendant." *Commonwealth* v. *Barrett, supra* at 794, citing *Commonwealth* v. *Helfant*, 398 Mass. 214, 225 (1986). "The judge's determination of these questions will be upheld on appeal absent palpable error." *Commonwealth* v. *Marrero*, 427 Mass. 65, 68 (1998), quoting from *Commonwealth* v. *Valentin*, 420 Mass. 263, 270 (1995).

The defendant claims that the judge committed error in allowing R.R.'s and M.H.'s testimony because their evidence of the defendant's sexual conduct was consensual between two adults and, therefore, not similar to the sexual acts alleged by the victim.

There is some question whether the sexual acts against R.R. were consensual, but in any event, even if the acts were consensual, we agree with the trial judge that both women's testi-

mony was admissible because their evidence demonstrated a similar modus operandi by the defendant with the two women as with the victim. The women sought out the defendant for spiritual guidance and comfort, as did the victim. He encouraged them to come to the rectory where he made sexual advances to them.[4]

Further, the evidence was probative of other issues that were raised during the trial, such as whether the victim's claims were based on fantasy, whether the defendant had the opportunity to commit the alleged sexual acts, and whether the rectory was such a public place that the incidents, if they had occurred as described by the victim, would have been discovered by a casual visitor.

The defendant argues, however, that the testimony of R.R. and M.H. was so prejudicial as to outweigh its probative value. While jurors may have looked with disfavor upon the defendant engaging in the conduct that the two women described, any prejudicial impact of the evidence was limited in part by the judge's limiting instructions, given both at the time of each woman's testimony and in his final instructions.

We also note that the jurors acquitted the defendant of the charge of assault with intent to rape. Such acquittal tends to confirm that the jurors appropriately considered the evidence as it related to each offense, and did not use the women's testimony to impute guilt.

Therefore, we hold that the judge did not commit error in admitting R.R.'s and M.H.'s testimony, as its probative value outweighed the prejudicial impact.

2. *The denial of the defendant's second motion for a new trial — nondisclosure of alleged exculpatory evidence.* In his second motion for a new trial, the defendant claimed that there were three items that constituted exculpatory evidence known to the prosecution and in its possession that were not disclosed to him. The three items were (1) a videotape of the wedding reception on August 12, 2000, in which the victim is seen dancing; (2) evidence from Joanne Lemieux regarding the location of the statue of "Our Lady"; and (3) Lemieux's claim that she told

---

[4] The evidence was not too remote in time. In R.R.'s case, the acts occurred at approximately the same time as the defendant's conduct with the victim; in M.H.'s case, a few months after.

the investigating officer that R.R. was not telling the truth when R.R. testified about the dancing incident with the defendant.

To prevail on his claim, "the defendant must establish that the [undisclosed] evidence existed, that it tended to exculpate him, and that the prosecution failed to deliver the information." *Commonwealth* v. *Schand*, 420 Mass. 783, 787 (1995). The defendant bears the burden of establishing each of these factors. *Commonwealth* v. *Healy*, 438 Mass. 672, 679-680 (2003).

"If the defendant has expressly requested the specific evidence, a showing of a substantial basis for concluding that the defendant has been prejudiced by nondisclosure requires the granting of a new trial." *Commonwealth* v. *Miozza*, 67 Mass. App. Ct. 567, 574 (2006). See *Commonwealth* v. *Tucceri*, 412 Mass. 401, 412 (1992). If there was no request or only a general request, a new trial is required only if the undisclosed evidence "create[d] a reasonable doubt that did not otherwise exist." *United States* v. *Agurs*, 427 U.S. 97, 112 (1976).

The motion judge, who was the trial judge, conducted a two-day evidentiary hearing at which four witnesses testified. After the conclusion of the hearing, the judge rejected the second motion for a new trial in a memorandum. The defendant claims error.

a. *Videotape recording of the wedding reception.* It is not disputed that the Commonwealth had in its possession prior to trial a videotape recording of the wedding reception; that the defendant was not aware of the existence of the videotape and did not request it; and that the Commonwealth did not give it to the defendant.

The defendant claims that the videotape was exculpatory evidence because it could have been used to impeach the victim. *Commonwealth* v. *Healy, supra* at 679 (exculpatory evidence includes, among other things, evidence that challenges the credibility of a key prosecution witness). The defendant points to a portion of the victim's testimony in which she stated that she was so upset about the defendant's conduct earlier that day, she tried to "hide" at the reception. Yet, the defendant argues, the videotape recording shows that she was dancing at the reception.

The defendant misinterprets the victim's testimony. The victim was asked, "Did you try to have any interaction with

[the defendant], at the wedding?" The victim answered, "No, I was trying to hide." In considering the question asked of the victim, her answer could be reasonably interpreted as meaning that she was trying to hide from the defendant, not from the other people at the reception.

The judge viewed the videotape at the hearing and described its contents in his memorandum of decision. On appeal, the defendant does not challenge the judge's description.

According to the judge, the videotape recording was of substandard quality and it was difficult even to recognize the victim in it. From what could be seen, the videotape confirmed the victim's testimony as to the dress she wore to the reception and that she was not a good dancer. The videotape recording showed the defendant briefly walking through the reception. There was no interaction between the victim and the defendant and they were never shown as being within the same area of the reception hall.

The judge ruled that the videotape was not exculpatory. We agree and hold that, in any event, a new trial is not required because even if the videotape had been disclosed to the defendant, it would not have "create[d] a reasonable doubt that did not otherwise exist." *United States* v. *Agurs, supra.*

b. *Lemieux's testimony.* Lemieux was a key witness for the defendant at the motion hearing. She was a housekeeper and cook at the rectory for many years; in 1998 she became a secretary at the parish. In that capacity, she worked at the rectory during the week but not on weekends. Although Lemieux was listed as a defense witness, she was never called to testify.[5] She did not attend the trial but followed the proceedings in the local newspaper.

At the motion hearing, Lemieux challenged the victim's trial testimony that she had prayed to a statue of "Our Lady" during one of the assaults committed by the defendant. Lemieux testi-

---

[5]The defendant claims that Lemieux's statements constitute "newly discovered evidence." Her statements are not "newly discovered" since she was listed as a defense witness. See *Commonwealth* v. *Sena,* 441 Mass. 822, 830 (2004) ("A defendant seeking a new trial on the ground of newly discovered evidence must first establish that the evidence was not discoverable at the time of trial despite the due diligence of the defendant or defense counsel").

fied that a short time before the victim was hired, extensive renovations were made to the rectory and all statues were removed. According to Lemieux, there was never a statue of "Our Lady" in the rectory at any time during the victim's employment. Further, Lemieux testified that she informed the investigating officer before the trial, and the prosecutor and a victim advocate during the trial, of that fact. After Lemieux concluded her testimony, both the prosecutor and the victim advocate testified at the hearing that they did indeed speak to Lemieux during the trial about the location of various statues and that Lemieux informed them that renovations had taken place *after* the victim left her employment at the rectory.

The judge ruled that Lemieux was not a credible witness. The judge noted that she became very friendly with the defendant after he arrived at the parish in 1999. She supported him during the trial and was not satisfied with the jury's verdict. According to the judge, Lemieux's testimony was "imbued with a certainty that simply is not credible."

After rejecting Lemieux's testimony, the judge concluded that "the prosecution did not have in its possession any exculpatory evidence regarding the timing of renovations or the location of the [Our Lady] statue."

The defendant challenges the judge's findings and rulings and argues that Lemieux's statements were indeed exculpatory, and because he made a specific request for her statements, he was entitled to "a standard of prejudice more favorable to [him]." *Commonwealth* v. *Tucceri*, 412 Mass. at 407.

"We do not disturb the factual findings of the motion judge unless they are clearly erroneous, and we must defer to his assessment of witness credibility." *Commonwealth* v. *Healy*, 438 Mass. at 676 n.6. We hold that the judge's findings were not clearly erroneous. Further, we need not determine whether the defendant made a specific request for Lemieux's statements, because even if we rule that her statements were exculpatory, a new trial is not required.

The presence or location of the statue was not a major issue at the trial. Rather, it was simply a detail mentioned by the victim. The critical issue was whether the defendant sexually assaulted the victim. Thus, the undisclosed evidence did "not carry a mea-

sure of strength in support of the defendant," *Commonwealth* v. *Tucceri*, 412 Mass. at 414, and a new trial was not warranted.[6] See *Commonwealth* v. *Brown*, 57 Mass. App. Ct. 852, 858 (2003).

Even if a specific request had been made for Lemieux's statements about the absence of the statue or R.R.'s dancing with the defendant (see note 6, *supra*), the defendant did not meet his burden of establishing that a substantial basis existed for claiming prejudice as a result of the nondisclosure. *Commonwealth* v. *Healy*, 438 Mass. at 680.

We affirm the judgments and the order denying the second motion for a new trial.

*So ordered.*

---

[6]Lemieux also testified at the hearing that during the trial she saw in a newspaper a discussion of R.R.'s testimony, including R.R.'s testimony as to dancing with the defendant and his provocative actions toward her at that time. According to Lemieux, she told an investigating officer that on a Monday she saw R.R. dancing with the defendant in a hallway in the rectory and it was entirely innocent. That evidence was not given to the defendant.

Once again, the judge did not find Lemieux's testimony credible. Even if the evidence were disclosed, it would not be of assistance to the defendant because the fact that Lemieux saw the defendant and R.R. dancing at a different time (on Monday and not on Sunday, as R.R. testified) and a different place in the rectory (in a hallway and not in the defendant's office) severely limited the probative value of Lemieux's claims.