## COMMONWEALTH *vs.* MICHAEL BENNETT.

No. 95-P-2172.

Worcester. March 12, 1997. - July 16, 1997.

Present: ARMSTRONG, KAPLAN, & KASS, JJ.

*Practice, Criminal,* New trial, Disclosure of evidence.

At a hearing on a criminal defendant's motion for a new trial, the judge should have determined what could have happened if the prosecution had fulfilled its pretrial duty to disclose certain exculpatory evidence and the jury had seen that evidence; where, on the record presented, there was substantial risk that the jury would have reached a different conclusion if they had heard the evidence and where the Commonwealth's case was a weak one for conviction, the judge should have allowed the defendant's motion. [160-163]

INDICTMENT found and returned in the Superior Court Department on April 9, 1992.

After review by this court, 38 Mass. App. Ct. 1112 (1995), a motion for a new trial was heard by *James P. Donohue,* J.

*Murray A. Kohn* for the defendant.

*Anne S. Manzello* (*Brian Cann,* Assistant District Attorney, with her) for the Commonwealth.

KAPLAN, J. Tried by jury and convicted of unarmed robbery,[1] the defendant learned during the sentencing hearing that the Commonwealth had withheld from him exculpatory evidence that might have weighed with the jury. He moved for a new trial; the trial judge without a hearing entered an order denying the motion. On appeal from the conviction and the judge's order to this court, we reversed the order and remanded the case for an evidentiary hearing of the new trial motion. The trial judge conducted such a hearing and denied the motion. On the present appeal from the denial, we again reverse, and now order a new trial.

---

[1] The judge allowed the defendant's motion for required findings of not guilty on three related indictments.

*Substance of the trial (October, 1992).* Lesa Zollo left work at "Top It Off," a clothing store on Highland Street in Worcester, around 6 P.M. on January 16, 1992. Walking to her car in a parking space at the corner of Highland and West Streets, Zollo saw a man "coming across between the back of two buildings," seemingly headed toward a nearby store. Aware of the dangers of the location at night, Zollo cut over diagonally to reach her car quickly. The man moved behind her as she entered her car. He pulled her out of the car and pinned her down beneath the car door. He kicked her and said, "Let it go. Let it go." He seized her pocketbook and made off and ran back between the two buildings. Zollo thought the attack lasted perhaps five minutes. The parking space was illuminated only by a street light of an old-fashioned green type.

During the next hour, Zollo went to the local police station. She described the man to Detective Faith Tozeski as a light-skinned black man, 5'7" to 5'9" in height, and said he was wearing oval-shaped thick plastic glasses and a short blue or black nylon jacket with a quilted lining.

Zollo was shown an array of photographs in black and white of seven black male faces and selected that of the defendant, assisting herself by drawing eyeglasses on the defendant's picture. She said she was confident "eight out of ten" that this was her assailant. Zollo was then shown an array in color of seven black male faces which included from the previous array only the defendant's picture; she selected that picture.

Detective Tozeski and her partner went searching for the defendant, who was known to Tozeski, and about 10:15 P.M. that evening they found him walking on Piedmont Street at a place one and one-half miles from the scene of the robbery. At the detective's request, the defendant came over to speak with her and entered the police cruiser. Tozeski told the defendant she was going to arrest him on an outstanding warrant (based on an extraneous charge). Promptly the defendant quit the car and fled. The police soon caught up with him hiding in an apartment in a building at 147 Austin Street, perhaps a mile and one-half from the crime scene. The defendant was a dark-skinned black man, 5'4" in height, he had on a tan coat over a gray hooded sweatshirt, he was not wearing eyeglasses and had none in his possession, and he had none of Zollo's property.

At a "one on one viewing" at the police station that evening Zollo recognized the defendant.

Tozeski testified that she had seen the defendant wearing eyeglasses at least five times but she could not remember when. The Commonwealth called another officer, Robert Couture. He said the defendant's apartment was three to four blocks from the crime scene. The officer said he had twice seen the defendant wearing glasses. He recalled one time within the last "six months at most" when he stopped the defendant outside a bar: he was wearing wire-rimmed glasses. But the defendant as part of his case (based essentially upon misidentification) showed that he was in the Worcester house of correction during the six-month period referred to (so it was the officer who probably misidentified); the defendant also established through a prison medical report that he had 20/30 vision in one eye and 20/20 vision in the other.

*Sentencing episode.* At the sentencing hearing on the same day as the guilty verdict, the prosecutor spoke of Zollo's victim impact statement and what it set forth:

> PROSECUTOR: "She has written up the victim witness statement. I think one of our people inside still has that. She did turn it over to me.

> "  . . .

> "The young lady tells me that the day after this crime, she got two calls on the same night or the following day by a man describing some of the effects she had in her purse."

> COURT: "Describing what?"

> PROSECUTOR: "Some of the effects she had in her purse. She didn't recognize the voice, she couldn't tell. She had some photos in her purse. She said at first I even thought it was my husband because of the words of intimacy he was using, but soon realized that [it] wasn't him, especially given the state I was in. I hung up the phone, he called back a few minutes later, he went on again and again describing some various pictures she had where she had modeled in the years past, and pictures she had kept where she had modeled different clothes, outfits, swimming suit outfits, things like that. If anything, that only aggravated my distraught even

more than being assaulted by this defendant. Given that someone out there I don't know, who knew where I lived, knew my phone number, knew my identity, knew what I looked like. . . . "

It is worth noting that Zollo said the caller was resorting to "some of the effects she had in her purse," and that he "described" them, particularly "various pictures she had." As to the pertinence of all this to sentencing, manifestly the prosecutor was suggesting to the judge, in aggravation of the crime of robbery itself, that the defendant was responsible for taunting and perhaps threatening the victim with salacious insinuations. Curiously, however, the prosecutor did not advert to whether the defendant was in any position to make those calls.[2] The judge sentenced the defendant to from eight to fifteen years imprisonment ("forthwith"),[3] beyond the four years, seven months guideline reported to the judge.

·*New trial peremptorily denied (February, 1994).* The defendant, through new counsel, appealed his conviction to this court. The appeal was stayed to permit him to move below for a new trial, which he did on January 31, 1994. The motion attacked the prosecutor's failure to disclose the potentially exculpatory information about the telephone calls until after the guilty verdict. The motion argued that the information so withheld, constituting newly discovered evidence, could have been a real factor in the jury's deliberations. The motion was documented and subjoined with sworn statements by defendant's trial counsel and previous counsel that they were not informed of the telephone calls which were disclosed only at sentencing. On February 3, 1994, the motion judge, who had been the trial judge, wrote "denied" on the motion without according any hearing, evidentiary or otherwise.

*Reversal and remand (March, 1995).* Upon review here, a panel of our court held that the judge had erred in denying the new trial motion out of hand. By memorandum and order pursuant to our rule 1:28, the panel remanded for an evidentiary hearing. The panel noted that Zollo had formally identified the

---

[2]As appeared in the eventual evidentiary hearing, the defense trial counsel was nonplussed by the prosecutor's late disclosure and did not react except to ask the judge to limit the sentence to the basic guidelines.

[3]Thus the sentence for the armed robbery would run in part alongside another sentence that expired in June, 1993.

defendant as the assailant, but that "the dangers of a good faith mistake in identification are well known. See *Commonwealth* v. *Dickerson*, 372 Mass. 783, 789 (1977)." Even without regard to the newly discovered evidence following from the prosecutor's late disclosure,[4] said the panel, there were reasons to doubt the identification: the discrepancies in skin color, height, and clothing; the perpetrator's wearing thick eyeglasses when the defendant had nearly perfect vision; and the lack of circumstantial evidence that it was the defendant who committed the crime.[5] The case was ordered remanded and the judge was directed to consider in an evidentiary hearing the events involved in the victim's impact statement and in particular to make findings, see Mass.R.Crim.P. 30(b), 378 Mass. 900 (1979), about when Zollo received the telephone calls and the content of the conversations. The judge was then to render his opinion whether the defendant was entitled to a new trial, citing *Commonwealth* v. *Tucceri*, 412 Mass. 401, 413 (1992): "The judge must determine whether there is a substantial risk that the jury would have reached a different conclusion if the evidence had been admitted at trial. *Commonwealth* v. *Grace*, [397 Mass. 303, 306 (1986)]. Would it have been a real factor in the jury's deliberations?"

*Evidentiary hearing (August, 1995).* The trial judge, as directed, conducted an evidentiary hearing. Principal witnesses called by the defendant were Tozeski, Zollo, and defendant's trial counsel. Tozeski and Zollo between them testified to the robbery, Zollo's description of the assailant, and so forth consistently with the evidence at the trial. Zollo described the two noncollect telephone calls she received at home at 8 A.M. the morning following the crime. The caller said, "Good morning, sexy" and Zollo answered, "Good morning," before she realized it was a stranger's voice. The caller went on to talk about her feet and

---

[4]In a pretrial conference report, the Commonwealth had promised "mandatory" disclosure of exculpatory evidence, and, under "discretionary" disclosure, the disclosure of written witness statements. The latter could be viewed as a "specific" rather than general request for exculpatory material. Compare *Commonwealth* v. *Gallarelli*, 399 Mass. 17, 21-22 (1987) (request for scientific reports and police reports considered specific). Failure to disclose a statement by Zollo would thus count more heavily against the Commonwealth than a delinquency related to a general request. See *Commonwealth* v. *Tucceri*, 412 Mass. 401, 405 (1992). For purposes of the present appeal, we need not insist on the distinction, as the case for a new trial is strong in any event.

[5]The panel might have added, and we now do, that as carried out, the photographic and one-on-one identifications were not reassuring.

sexy toes, said she had a nice body, and commented on various parts of her anatomy, her basic body shape, and upper torso. Discomfited and insulted, Zollo hung up. The phone rang again, the caller started with, "Good morning, sexy," and Zollo hung up. She testified that the caller did not refer specifically to any of the contents of her stolen pocketbook, but it was her impression that the caller had the contents before him, in particular a photo taken some years earlier of herself in a bathing suit, a time when she was slimmer and more shapely and sensuous than at present. Zollo also observed that the caller presumably got her home telephone number from material in the pocketbook (her number had been changed recently).

Accordingly, considering the improbability that the defendant could have made the calls from detention, there was a likelihood that the caller was the very assailant who remained at large.

Zollo said she had received salacious calls from time to time in the past at work and at home. She attributed these to the fact the shop handled lingerie. She was shaky whether she had signed a victim impact statement.

Counsel who tried the case for the defendant reiterated in his testimony that he learned about the telephone calls only after verdict.

On the part of the Commonwealth, the prosecutor — who served at the trial and on the motion — took the witness stand and was examined by a colleague. He now gave it as his recollection that he had in fact advised defense counsel of the telephone calls before verdict, and further, that the matter was somehow laid before the judge (although nothing of the sort appeared in the trial transcript). He was blurry and indefinite about a victim impact statement. Taken in cross-examination, the prosecutor was reminded of his duty to tell the truth and was confronted with the transcript of his remarks at the time of sentencing. The prosecutor responded, "I can't imagine how I could have said that" (at sentencing).[6]

---

[6]We omit discussion of witnesses called by the defendant at the evidentiary hearing in an effort to show that one Troy Neely might have committed the crime with which the defendant was charged. Neely more nearly resembled Zollo's description of the perpetrator than did the defendant, and his modus operandi — attacks on lone women — looked like the perpetrator's. The recurrent purse snatchings in the area did not abate when the defendant was arrested in January. 1992. Neely was arrested in January. 1993, charged with a series of recent purse snatchings; these crimes ceased with his arrest. However,

*Judge's negative conclusion.* In his "Findings of fact, rulings of law, and order on defendant's motion for a new trial," the judge reviewed the Commonwealth's case at trial and acknowledged its weakness — take the inconsistency between Zollo's description of the assailant and the defendant's actual appearance. The judge accepted that Zollo had signed a victim impact statement (now lost) of whose content defense counsel was informed after, not before, the verdict. The judge appeared to agree that the prosecution was at fault in failing to make timely disclosure of the telephone calls which figured as exculpatory material and probably as part of Zollo's witness statement (see note 4, *supra*).

Analyzing the substance of the calls, what stuck with the judge was that, according to Zollo's testimony, the caller did not describe specifically any items contained in the pocketbook, the bathing suit picture or anything else. When Zollo assumed or inferred, because of the caller's talk of her bodily features and his possession of her telephone number, that he had access to the pocketbook and might therefore be the assailant, she was making, the judge said, an "unsupported assumption." The judge also said the question whether the defendant himself could have made the calls from detention "was not fully resolved."

The judge thus concluded in effect that only (1) where the caller specifically described items in the pocketbook, and (2) it was shown there was no remaining likelihood that the defendant could have made the calls from detention, would evidence of the telephone calls, if admitted at trial and heard by the jury, figure as a real factor in their deliberations or raise a substantial risk that they would reach a different conclusion. On this basis the judge ruled against a new trial.

*Present appeal.* The judge might have observed that his rigid formula had once in fact been complied with. The prosecutor at sentencing reported that, according to Zollo, the caller described some of the contents of the pocketbook. This measurably fulfilled the first part of the judge's formula. As for any likelihood that it was the defendant who was the caller, this must be counted so slight as to be negligible. We would have to assume that on the night, sometime before his arrest, the defendant committed to memory Zollo's telephone number, together with an appreciation

the year's difference of time, besides other factors, made attribution of. the instant offense to Neely difficult to sustain.

of her bodily proportions, and then accomplished a feat of telephoning her twice from detention.[7] So the second part of the formula was in substance satisfied. And we need to recall that the prosecutor was reporting Zollo's recollection of the calls as of some months, not years, after the event.

The judge, however, fastened on Zollo's testimony at the evidentiary hearing in 1995, and we follow suit. Zollo then said it was her impression that the caller had access to the contents of the pocketbook, notably the photo or photos and the telephone number. This would not do under the judge's strict formula, but we submit that the formula was arbitrary and was not sensitive to how a jury might go about deciding the case. Our goal is to divine how a jury would react if they heard Zollo's statement of her impression. It is not a question of the weight a judge would assign to this information; rather the jury must be taken as the reagent. As the court said in *Tucceri*, 412 Mass. at 411:

> "The law of the Commonwealth thus preserves, as well as it can in the circumstances, the defendant's right to the judgment of his peers. The issue, we think, is not what, if any, impact the late disclosed evidence has on the judge's personal assessment of the trial record. After all, the goal is to determine what could have happened if the prosecution had fulfilled its pretrial duty to disclose the exculpatory evidence and the jury had seen [that evidence]."

How the jury would react is of course a matter of speculation, but we think there is good ground to believe that the jury would attend seriously to Zollo's impression or inference that a person, very likely not the defendant,[8] was in possession of the contents of the pocketbook and thus fell under the suspicion of being the perpetrator. Indeed, the judge in colloquy with counsel recognized that the jury might take just that line. The judge said:

---

[7]We have of record a paper dated March 20, 1992, from the Worcester house of correction which outlined the policy of the institution regarding telephone calls by inmates. The paper, dealing also with other subjects, called for authorization by higher authority, which apparently was given on January 12, 1993, but the telephone policy strikes us as having been ongoing. In short, the policy would not admit of the defendant's being able to make the two telephone calls at 8 A.M. on January 17, 1992. (This matter can be readily clarified at retrial.)

[8]See discussion at note 7, *supra.*

"Now, if she [Zollo] felt that way, why don't you think the jury would feel the same way?

"  . . .

"You decide the case on inferences, don't you? I mean, the jury could decide — couldn't they infer, just draw the same inference that she drew?"

This reaction and line of thought was the more likely because, apart from the information withheld by the Commonwealth, the case was a weak one for conviction. With the scale teetering in balance on the basic circumstances of the crime, it would be quite natural for the jury to pay attention to collateral factors and even to make them decisive. Regarding the bearing of the weakness of the Commonwealth's case upon the allowance of a new trial based on new evidence (including exculpatory evidence previously withheld), compare *Commonwealth* v. *Ellison*, 376 Mass. 1, 3 (1978); *Commonwealth* v. *Woods*, 382 Mass. 1, 9 (1980); *Commonwealth* v. *Gallarelli*, 399 Mass. 17, 22 (1987); *Commonwealth* v. *Vaughn*, 32 Mass. App. Ct. 435, 441-442 (1992); *Commonwealth* v. *Trung Chi Truong*, 34 Mass. App. Ct. 668, 674-675 (1993).

We are by no means saying that Zollo's testimony, if heard by the jury, would necessarily persuade them to acquit. The jury might consider the possibility (also a possibility where the judge's formula is strictly applied) that the defendant, having committed the crime, discarded the pocketbook which happened to be picked up and then exploited by a stranger. Conceivably the caller was just one of Zollo's mashers. But justice requires that a jury on retrial shall receive the information about the telephone calls and appraise and decide. See *Tucceri*, 412 Mass. at 413-415:

"Our standard recognizes the role of the jury. It also does not mandate, as a condition of the granting of a new trial, that a judge conclude that a reasonable doubt would have been created if the undisclosed evidence had been before the jury. It is enough that, on a full and reasonable assessment of the trial record, the absent evidence would have played an important role in the jury's deliberations and conclusions, even though it is not certain that the evidence would have produced a verdict of not guilty."

Finally, we say that a new trial seems quite appropriate where the Commonwealth withheld exculpatory evidence until after verdict, then used it in dubious fashion to try to increase the sentence, then attempted to claim that it had in fact disclosed the evidence to defense counsel before verdict, then gave an indefinite account of the material document, which it lost or could not produce.

We are mindful that the views of the motion judge on an issue of new trial, especially when he or she was also the trial judge, are entitled to much respect. This, however, is an instance where the criteria expressed by the judge in denying the motion were not suited to the situation and in our opinion led to error.

The judgment is reversed, the verdict is set aside, and the case will stand for a new trial if the Commonwealth is so advised.

*So ordered.*