COMMONWEALTH *VS.* BENJAMIN LAGUER.

Worcester. January 4, 2007. - March 23, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & SOSMAN, JJ.[1]

*Evidence,* Exculpatory, Fingerprints, Disclosure of evidence. *Due Process of Law,* Disclosure of evidence. *Practice, Criminal,* Disclosure of evidence, New trial.

A criminal defendant was not entitled to a new trial or entry of an order dismissing the indictments against him on the ground that the Commonwealth failed to produce allegedly exculpatory evidence in the form of a fingerprint report that the defendant claimed could have established that a third party had committed the crime, where the Commonwealth did furnish the defendant, in a timely fashion, with fingerprint evidence in the Commonwealth's possession that was in fact exculpatory [593-597]; where the defendant failed to demonstrate that the undisclosed fingerprint evidence had any bearing on the defendant's guilt or innocence [597-599]; and where, at any rate, no substantial basis existed for claiming prejudice from the nondisclosure, given the powerful evidence that connected the defendant to the crimes [599-601]; similarly, the loss or destruction of the actual fingerprints and a portion of the fingerprint report did not violate the defendant's right to a fair trial, where the defendant did not show a reasonable possibility that the Commonwealth's actions deprived him of evidence that would have been favorable to his case [601-602].

INDICTMENTS found and returned in the Superior Court Department on August 4, 1983.

A motion for a new trial, filed on February 11, 2004, was heard by *Timothy S. Hillman,* J., and a motion for reconsideration was considered by him.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*James C. Rehnquist (Kathleen Luz* with him) for the defendant.

*Sandra L. Hautanen,* Assistant District Attorney, for the Commonwealth.

[1]Justice Sosman participated in the deliberation on this case prior to her death.

*Debra S. Krupp*, Committee for Public Counsel Services, for Committee for Public Counsel Services, amicus curiae, submitted a brief.

Cowin, J. On January 30, 1984, the defendant was convicted of aggravated rape, unarmed robbery, breaking and entering in the night time with intent to commit a felony, and assault and battery. He was sentenced to life in prison for the aggravated rape conviction.[2] His convictions were affirmed by the Appeals Court, see *Commonwealth* v. *Laguer*, 20 Mass. App. Ct. 965 (1985), and further appellate review was denied, see 396 Mass. 1103 (1985).

All the charges arise from a brutal sexual attack on a fifty-nine year old woman living alone in an apartment in Leominster at a time when the defendant resided in the next apartment. The main issue at trial was the identity of the perpetrator. The defendant now seeks a new trial or entry of an order dismissing the indictments because the Commonwealth failed to produce allegedly exculpatory evidence in the form of a fingerprint report that the defendant claims could have established that someone else committed the crime.[3] A judge in the Superior Court who was not the trial judge denied the requested relief as well as the defendant's subsequent motion for reconsideration. The Appeals Court affirmed the Superior Court orders, *Commonwealth* v. *Laguer*, 65 Mass. App. Ct. 612 (2006), and we allowed the defendant's application for further appellate review. We affirm.

1. *Evidence at trial.* A jury could have found the following facts. At approximately 9 p.m. on July 12, 1983, a man broke into the victim's apartment, turned off the light, "socked the side" of her face, threw the victim to the floor, and raped her vaginally, anally, and orally for the following eight hours. The

---

[2]On the unarmed robbery and breaking and entering charges, defendant received sentences of from twelve to fifteen years at the Massachusetts Correctional Institution at Cedar Junction to run concurrently with the sentence on the aggravated rape charge. The conviction for assault and battery was filed with the defendant's consent.

[3]Since his conviction, the defendant has filed several other motions for new trial or other relief. See, e.g., *Commonwealth* v. *Laguer*, 410 Mass. 89 (1991); *Commonwealth* v. *Laguer*, 36 Mass. App. Ct. 310 (1994). None of the issues raised in these motions is relevant to the present appeal.

attacker was wearing only jogging shorts and white socks, pos-
sibly with stripes on the top.[4] The attacker severely beat the
woman and, before leaving, stole her jewelry, money, and a
purse,[5] and bound her hands with a cord from her telephone and
her feet with a cord from a hair dryer. At one point, the rapist
put a plastic trash bag over the victim's head, tied it tightly, and
caused her to "[go] .out of the picture," but she "[e]ventually
. . . c[a]me back into the picture." The victim "fought" and
struggled with her assailant. She was able to see the man's face
as the room was illuminated by outside security lights, and the
rapist made no attempt to hide his face, except when he went to
the bathroom. He warned the woman that if she identified him,
he would kill her.

The victim was found shortly after 5:10 A.M. on the morning
of July 13, when a maintenance man heard her cries for help
and telephoned the police. She was lying naked on the floor
with her hands and feet bound, serious physical injuries, a
bloody nose, bloody fingernails, and blood on one hand. Many
of the items in the studio apartment were blood-stained.
Emergency medical personnel transported the victim to the
hospital; "at least seven" police officers were at the apartment
processing the scene and collecting evidence for most of the
day.[6] At some point that morning, the only telephone in the unit
was "dusted" for fingerprints by the local police. The assailant
had used the cord from this telephone to bind the victim's
hands. The telephone was later delivered to the State police for
further fingerprint testing. The maintenance man remained in
the apartment with the police, but neither the police nor the
maintenance man saw the defendant that day.

It was undisputed that at the time of the incident and for the
preceding two weeks, the defendant was staying with his father

---

[4]The victim testified that the defendant "may have put a sock in [her]
mouth," and one white "tube" sock with colored stripes was found tangled
with her bloody sheets and pillowcases. (The victim did not own any white
socks with stripes.) To a certain degree, there was a possible discrepancy in
the victim's description as to the stripes. This was explored by defense counsel.

[5]The purse was later found outside near the building where the victim lived.

[6]Vaginal and rectal swabs and pubic hair of the victim were preserved at
the hospital and were later used to conduct deoxyribonucleic acid (DNA)
tests. See note 34, *infra.*

in the apartment immediately next to the victim's apartment. (His father was on vacation at the time of the incident.[7]) The victim testified that one or two weeks prior to the attack, the man she later identified as her attacker had rung the bell of her apartment to gain access to a common hallway to the building.[8,9] She had opened her door, but on seeing the defendant, had closed it immediately. She ordinarily had no visitors other than her daughter.

At first, the victim told the police that she was unable to identify her attacker and provided merely a general description: a short black male with a small build.[10] The following day, while still hospitalized, the victim told the police that the attacker was the "dark" man who had recently "buzzed" her apartment. She explained that she originally did not identify anyone because of the assailant's threats to kill her for doing so.[11] The next day, July 15, the police obtained a photograph of the defendant, and the victim identified him from a photographic array.[12] She was certain of her identification. At trial, she pointed out the defendant as her assailant.

On the day of the attack, the victim left her keys in the door to her apartment. She realized her mistake minutes later and went to retrieve the keys, but they had disappeared. She obtained another set of keys from the building manager. This sequence of events was confirmed by the manager. The defendant testified at trial that he had seen the victim's keys hanging from her front door lock on two or three prior occasions and had knocked on her door to return the keys each time. The victim denied that the defendant had ever done so.

[7]The defendant sometimes stayed with a sister at another location.

[8]A locked foyer door inside the building prevented entry unless one had a key or was "buzzed in" by a person in an apartment.

[9]The defendant testified that the first two days he stayed in his father's apartment he had no key and relied on his father to "buzz" him in.

[10]According to the defendant's arrest report, he was five feet, eight inches tall and weighed 150 pounds. His size was obvious during the trial. *Commonwealth* v. *Zane Z.*, 51 Mass. App. Ct. 135, 147-148 (2001).

[11]The victim repeatedly informed the emergency room doctor who treated her the morning following the rape that "the assailant would kill me if I told what he looked like."

[12]The victim selected the defendant's picture again from the array shortly before trial and again at trial.

Shortly after the victim was transported to the hospital, police canvassed the other apartments to see "if anybody heard anything." An officer knocked on the defendant's door numerous times, but there was no response. The following day, after the victim had identified her attacker as her next-door neighbor, the police executed a search warrant for his apartment. Although no one was there, the officers observed in drawers and on the floor many mismatched white "tube" or "athletic" socks with stripes on the top.[13] When the police returned to the defendant's apartment the following day, he was at home wearing only jogging shorts and white "tube" socks with mismatched colored stripes at the top, the same attire the victim had described her attacker as wearing. The police observed and photographed a "fresh scratch on his back, all across," and the photograph was shown to the jury. The defendant first explained to the police that the scratch was from a nail at a bar, but at trial said that it was caused by splinters or nails when he had been lying on a picnic table, several days earlier. He also stated that he had been at home during the time of the attack but had heard no noise from the apartment next door.[14] He testified that he had not seen any police at all on the day following the attack (despite the fact that several police officers entered and left the victim's apartment that day), and that he did not hear the police knock on his door.

The police collected numerous pieces of physical evidence from the victim's apartment, many of which were stained with blood. Several items in the unit were also "dusted" for fingerprints. None of the physical evidence was linked to the defendant. Detective Carignan, the investigating officer, testified that he had recovered a fingerprint from the base of the victim's telephone and delivered it to the State police laboratory for analysis. He also stated that he did not find any fingerprints in the victim's apartment that matched the defendant's fingerprints. Although the defendant's saliva was tested to see if his blood type matched any blood found at the scene or the

[13]Apparently, none of the "tube" socks in the defendant's apartment had the same color stripe as the one left in the victim's apartment.

[14]The defendant explained that there was noise from outside. A nearby factory operated twenty-four hours per day.

sperm cells or seminal fluid on the victim's pubic hair, the tests were "inconclusive."[15]

The defendant testified and denied committing the crimes. His defense was misidentification, and he suggested that the rapist was a young,[16] dark-skinned Hispanic male, Jose Gomez, who lived in an apartment within the same complex (across the street from the victim) and who had moved out seven months before the rape.[17] Two witnesses called by the defendant placed him with them, away from the crime scene during part of the relevant period. These alibi witnesses were his half-sister and a young man who did not know the defendant's name, and admitted to drinking "seven days a week" at a bar where he said he had seen the defendant on the night of the rape, six months earlier. He told no one about seeing the defendant in the bar until the night before he testified. This witness said that the defendant stuttered — and apparently, the defendant stuttered while testifying — a fact about her attacker the victim had not mentioned to anyone. In his closing argument, defense counsel stressed that despite the fact that the rapist had been in the apartment for eight hours, no physical evidence linked the defendant to the crime scene.

2. *The missing fingerprint report.* Prior to trial, the defendant requested discovery of all exculpatory evidence, including any fingerprints found in the victim's apartment.[18] Approximately one month before trial, the prosecutor informed defense counsel by telephone that a partial fingerprint lifted from the base of the victim's telephone had been analyzed and did not match any of

---

[15]Unbeknownst to the Commonwealth at the time of trial, the defendant intentionally tampered with his court-ordered saliva sample (obtained in an attempt to match his blood type with the blood found at the scene or the sperm cells or seminal fluid on the victim's pubic hair), by mixing his saliva with that of another inmate. The defendant admitted to this in 2003, nearly twenty years later, at a parole board hearing.

[16]The defendant was twenty years old at the time of trial.

[17]To further his defense of misidentification, the defendant challenged the victim's testimony about the adequacy of the lighting in her apartment, as well as her memory, eyesight (she did not have her reading glasses on at the time of the attack or when she selected the defendant's photograph in the hospital), physical condition (one eye was swollen shut from being beaten), mental stability, and reactions to medication.

[18]These requests were made in the pretrial conference report and in two letters sent to the prosecutor.

the defendant's fingerprints. The prosecutor also wrote to defense counsel that he would forward a copy of the fingerprint report as soon as he received it. Apparently, the fingerprint report was never received by the prosecutor, and trial proceeded on the assumption by all parties that the only fingerprint found in the apartment was the partial print[19] from the telephone that did not match the defendant's fingerprints. Thus, the defendant was aware that the Commonwealth had no physical evidence connecting him to the scene of the rape.

Following his conviction, the defendant filed several public record requests for fingerprint information. One such request resulted in the Commonwealth disclosing, in November, 2001, nearly eighteen years after the defendant's convictions, the front page of a fingerprint report previously unknown to the defendant. The report was dated July 15, 1983, two days after the incident. The report states that four fingerprints (not one, as had been reported previously) were located on the base of the victim's telephone, and that none matched the defendant's.[20] The report indicates that these results were communicated to the Leominster detective who was investigating the crime.[21] The back page of the report may be missing, see note 36, *infra*, and the fingerprints themselves have never been located.[22]

3. *Motion for a new trial.* The fingerprint report and the

---

[19]The term "partial print" is used to mean something less than a complete fingerprint, which is the rolled ink imprint taken by the police when a person is arrested. Fingerprint impressions left on items "are almost always partial." See *Commonwealth* v. *Patterson*, 445 Mass. 626, 629 (2005). Thus, the use of the word "partial" to describe the fingerprint is not significant.

[20]It is unclear whether there were four fingerprints on the telephone in addition to the one Detective Carignan located or whether the total number of fingerprints on that instrument was four. The difference is immaterial to our analysis.

[21]A prosecutor's duty to disclose exculpatory evidence extends to evidence in his or her possession as well as that in the possession of the police who participated in the investigation and presentation of the case. See *Commonwealth* v. *Tucceri*, 412 Mass. 401, 407 (1992). There is no suggestion that either the evidence regarding the fingerprint report or any fingerprints were transmitted at any time to the trial prosecutor.

[22]The fingerprint report refers to four latent fingerprints located at the "base of trimline phone" and states: "On 7/15/83 at approx 2:30pm Det Carrigan [*sic*] brought a beige colored base of a telephone to the lab to be examined for prints. Several prints were lifted and a comparison made with a suspect Benjamin Laguer 5/1/63 with neg results. On 7/16/83 at 9:15 Det Car-

missing fingerprints are the basis for the present motion for a new trial. The defendant claims that, pursuant to the Fifth and Fourteenth Amendments to the United States Constitution, art. 12 of the Declaration of Rights of the Massachusetts Constitution, and Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), a new trial is required because of the Commonwealth's suppression of exculpatory evidence. Specifically, he claims that the fingerprint report, timely disclosed, would have permitted him to impeach the victim's identification, and buttress his defense of mistaken identity, by helping to establish the presence of a different perpetrator. He also contends that, given the loss or destruction of the actual fingerprints and the back page of the fingerprint report, pursuant to *Commonwealth* v. *Olszewski*, 401 Mass. 749 (1988), *S.C.*, 416 Mass. 707 (1993), cert. denied, 513 U.S. 835 (1994), dismissal of the indictments, or, alternatively, a new trial, is the appropriate remedy.[23] In support of the motion, trial counsel submitted an affidavit that he "understood at the time of trial that the partial print [on the telephone] could not be matched to Benjamin LaGuer . . . . Had I learned that four complete fingerprints[24] had been found on the telephone, . . . and that these had not matched Benjamin LaGuer, I would have pursued additional questions of Det. Carrigan [*sic*], concerning his efforts or lack thereof to match these prints to anyone else and to exclude the victim. Additionally, I would have made the exculpatory nature of these prints, and the lack of effort to identify them, important parts of my closing argument."

The judge denied the motion for a new trial. He concluded that there was no due process violation, because such a claim required the defendant to prove that the evidence was, in fact, exculpatory, and the lack of evidence that the fingerprints were left on the telephone at the time of the crime deprived them of

---

rigan [*sic*] was informed via telephone." The use of the word "several" apparently relates back to the specific reference to four latent fingerprints found on the base of the telephone.

[23]We consider this claim at the end of this opinion.

[24]Despite trial counsel's characterization of the four fingerprints as "complete," there is no evidence in the record that the four fingerprints referenced in the report were anything other than the partial fingerprints that are normally recovered. See notes 19 and 22, *supra*.

probative value. The judge also concluded that the fingerprint report would not have "significantly aided" the defendant's case because it did not compromise the victim's credibility or her identification made after observing her attacker "in an illuminated room" during an eight-hour attack. Assuming for purposes of argument that the fingerprint report was exculpatory, the judge decided that, given the strength of the Commonwealth's evidence, the additional evidence of the four fingerprints on the telephone would not have influenced the jury's deliberations. The Appeals Court reached the same conclusion for essentially the same reasons. *Commonwealth* v. *Laguer*, 65 Mass. App. Ct. 612, 619-622 (2006).

4. *Discussion.* The defendant claims that the Commonwealth, in violation of his Federal and State constitutional rights, withheld exculpatory evidence that would have materially aided his defense. Due process requires that "the government disclose to a criminal defendant favorable evidence in its possession that could materially aid the defense against the pending charges." *Commonwealth* v. *Daniels*, 445 Mass. 392, 401 (2005), quoting *Commonwealth* v. *Tucceri*, 412 Mass. 401, 404-405 (1992). Where, as here, "a judge hearing a motion for new trial was not the trial judge, 'we regard ourselves in as good a position as the motion judge to assess the trial record.' " *Commonwealth* v. *Healy*, 438 Mass. 672, 678 (2003), quoting *Commonwealth* v. *Salvati*, 420 Mass. 499, 500 (1995). "[W]hen a new trial claim is constitutionally based, as in the instant case[], 'this court will exercise its own judgment on the ultimate factual as well as legal conclusions.' " *Commonwealth* v. *Healy*, *supra*, quoting *Commonwealth* v. *Salvati*, *supra*.

In *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963), the United States Supreme Court concluded that the government was constitutionally obligated to disclose material, exculpatory evidence for which the defendant had made a specific request. This requirement was extended in *United States* v. *Agurs*, 427 U.S. 97 (1976), to defendants who made only general requests for exculpatory evidence or no request at all. See *Commonwealth* v. *Tucceri*, *supra* at 405. "The *Agurs* opinion distinguished between a specific request and a general request for exculpatory evidence in determining whether the prosecutor's

omission warranted a new trial," *id.*, and adopted a different standard for each situation. When a specific request has been made, a new trial is required if the undisclosed evidence "might have affected the outcome of the trial." *United States* v. *Agurs, supra* at 104. When there is no request or only a general request, a new trial is required only if the undisclosed evidence "create[d] a reasonable doubt which did not otherwise exist." *Id.* at 112.[25] To the extent that there is a meaningful difference in the two standards,[26] we have described the standard to be applied when, as here, the prosecution has failed to disclose after a specific request, as requiring only that a defendant demonstrate "a substantial basis exists for claiming prejudice from the nondisclosure." *Commonwealth* v. *Tucceri, supra* at 412, and cases cited. We examine the record to decide "whether we can be confident that, even if the prosecution had supplied the report to the defendant[] in timely fashion, the report or available evidence disclosed by it would not have influenced the jury." *Commonwealth* v. *Healy, supra* at 680, quoting *Commonwealth* v. *Daye*, 411 Mass. 719, 729 (1992). Put differently, we must decide whether there is a reasonable possibility that the nondisclosed evidence would have made a difference.

"The *Brady* obligation comprehends evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." *Id.* at 679, quoting *Commonwealth*

---

[25]Subsequently, in *United States* v. *Bagley*, 473 U.S. 667, 682 (1985), the United States Supreme Court adopted one standard of prejudice ("materiality") for all nondisclosure cases: "The evidence is material [i.e., requires a new trial] only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." We have declined, as a matter of State law, to adopt the single *Bagley* standard, see *Commonwealth* v. *Gallarelli*, 399 Mass. 17, 21 n.5 (1987), and continue to employ the two different standards as set forth in *United States* v. *Agurs*, 427 U.S. 97, 104, 112 (1976).

[26]The difficulties created by *United States* v. *Agurs*, 427 U.S. 97 (1976), are well explored by Justice Kaplan in *Commonwealth* v. *Ellison*, 376 Mass. 1, 23-24 (1978). See *Commonwealth* v. *Tucceri*, 412 Mass. 401, 405 (1992).

v. *Ellison*, 376 Mass. 1, 22 (1978).[27] Obviously, in order to prevail on a claim that the prosecution failed to disclose exculpatory evidence, the defendant must establish that the evidence was, in fact, exculpatory. *Id.* at 679, and cases cited. "Evidence may be favorable or exculpatory, and thus required to be disclosed, 'although it is not absolutely destructive of the Commonwealth's case or highly demonstrative of the defendant's innocence.' " *Commonwealth* v. *Daniels, supra* at 401, quoting *Commonwealth* v. *Ellison, supra* at 22. Rather, "exculpatory" in this context comprehends all evidence which tends to "negate the guilt of the accused" or support the accused's innocence. *Commonwealth* v. *Healy, supra* at 679, quoting *Commonwealth* v. *St. Germain*, 381 Mass. 256, 261 n.6 (1980).

We conclude that, in the unusual circumstances of this case, the fingerprint evidence that was not produced[28] has not been shown to have any bearing on the defendant's guilt or innocence, and is consequently not exculpatory as to this defendant. See *Commonwealth* v. *Healy, supra* at 679. What is exculpatory is that the Commonwealth could not place the defendant in the victim's apartment by means of any evidence, including any fingerprints or any other physical evidence. At trial, the defense was well aware of that weakness in the prosecution's case and fully exploited it. For example, in cross-examination, defense counsel asked Detective Carignan, "The man was in there eight hours and you didn't find one print that

[27]It bears repeating that the Commonwealth's duty to disclose exculpatory evidence is not dependent on a request by the defense for such evidence. The Commonwealth has a duty to disclose all exculpatory evidence, requested or not. See *United States* v. *Agurs*, 427 U.S. 97, 110 (1976); *Commonwealth* v. *Tucceri*, 412 Mass. 401, 405 (1992). As discussed, the existence of a specific request only affects the standard of review. See *United States* v. *Agurs, supra*; *Commonwealth* v. *Tucceri, supra*. "A rule that encourages prosecutors to make pretrial disclosures of obviously or even arguably exculpatory material . . . not only promote[s] fair trials but . . . also help[s] to avoid the difficulties of posttrial judicial review." *Id.* at 406-407 (footnote omitted).

[28]The "fingerprint evidence that was not produced" or the "nondisclosed fingerprint evidence" refers to the State police fingerprint report identifying the existence of four fingerprints that do not match Laguer's, as well as the fingerprints themselves. Again, it is unclear whether the "four fingerprints" refer to three fingerprints plus the one Detective Carignan lifted, or to four additional fingerprints. See note 20, *supra*.

matched [the defendant's]?," to which the response was, "No, I did not find *any* prints to match" (emphasis added). When asked, "Anything come back that matches [the defendant]?," Detective Carignan answered, "Nothing." In closing argument, defense counsel stated, "There is not one piece of evidence, physical or otherwise, that puts [the defendant] in [the victim's] apartment . . . ." The point was made to the jury that, despite the assailant's presence in the apartment for eight hours and his use of the cord from the telephone to bind the victim, no fingerprints of the defendant's and no other physical evidence linking him to the crime were located.[29] See *Squires* v. *Dugger*, 794 F. Supp. 1568, 1578-1579 (M.D. Fla. 1992) (denying *Brady* claim because undisclosed fingerprint report with nonmatching prints would not have led to acquittal, and cross-examination of government expert made it clear that none of fingerprints found matched petitioner's fingerprints — "the exact point the petitioner needed to make").

Not only was there no evidence linking the defendant to the telephone, but there also was one fingerprint on that telephone that did not belong to the defendant. Accordingly, the fingerprint evidence did not permit the jury to draw any inference that the defendant picked up the telephone. To the contrary, the existing fingerprint evidence pointed away from the defendant. The fingerprint on the telephone did not belong to him, and the defense attorney made this fact abundantly clear to the jury.

Thus, the defendant was furnished, in a timely fashion, with evidence in the Commonwealth's possession that was in fact exculpatory. The defendant knew, and used at trial, the information that the prosecution's case was not based on any physical evidence of his presence in the victim's apartment at the relevant time (or, for that matter, at any time). He therefore was aware of that evidence which "provides some significant aid to [his] case, . . . furnishes corroboration of [his] story, calls into ques-

---

[29]It is suggested that Detective Carignan's testimony that he found a small partial print on the telephone might have misled the jury to believe that the print was not identifiable. Any ambiguity was clarified by defense counsel's cross-examination establishing that there were no prints matching the defendant's in the apartment. The evidence does not support the speculation that the jury might have believed that the print found was too small to have been identified.

tion a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness'' (in this case, the victim with respect to her identification of her attacker). *Commonwealth* v. *Healy, supra* at 679, quoting *Commonwealth* v. *Ellison, supra* at 22. What is important is that the defendant's fingerprints were not present on the telephone. That there could have been one, four, or more fingerprints on the telephone does not render that fact more exculpatory than informing the jury that one fingerprint did not match the defendant.

We consider next whether the remaining three or four fingerprints on the telephone, see note 20, *supra*, the existence of which was not disclosed, are exculpatory because of the possibility that one or more might belong to an individual, other than the defendant, who actually committed the crime. Nothing in the report identifies the source of the fingerprints on the telephone. While it is certainly possible that, because the rapist used the telephone cord to bind the victim, he grasped the base of the instrument, it is entirely speculative to assume that the fingerprints on the telephone belonged to a third party suspect rather than to the victim, her daughter, or the police who were in the room the day following the crime while the telephone remained there. Thus, the mere existence of the fingerprints by itself, without other evidence or explanation, creates no reasonable basis for believing a third-party suspect would have been revealed.

In addition, it is clear that, even if trial counsel had known about the additional fingerprints, he would not have attempted to identify them. The defendant claims in his brief before this court that he would have used the four fingerprints to attempt a match to the alleged third party suspect, Jose Gomez. Such a claim is notably absent from trial counsel's affidavit. In his paragraph describing how he would have used the information about the four fingerprints, trial counsel states only that he would have "pursued additional questions of Det. Carignan" about his efforts to match the fingerprint to anyone else and that he would have made the "exculpatory nature of these prints and the lack of effort to identify them, important parts of my closing argument." Trial counsel does not state or even imply that

he would have sought to match the four fingerprints to Gomez or to anyone else. To forgo testing of other fingerprints is a reasonable tactic: the defense was that the partial fingerprint belonged to a named third party suspect. Counsel would hardly risk a fingerprint analysis of that (or any other) print that could exonerate the third party. The omission from trial counsel's affidavit is consistent with the defense strategy at trial. Trial counsel was aware that the partial print on the telephone did not match the defendant's prints; he made no attempt to match that fingerprint to Gomez or anyone else.[30],[31]

We conclude that the undisclosed fingerprint evidence is not exculpatory here for an additional reason. For fingerprint evidence to be probative, it must be linked to the time of the crime, that is, there must be evidence to establish when the fingerprints were placed on the telephone. See *Commonwealth v. Morris*, 422 Mass. 254, 257-258 (1996) (defendant's fingerprint found on mask used by intruder insufficient to support conviction because it could not be determined when fingerprint had been placed on mask and no other evidence sufficiently linked defendant to crime). Cf. *Commonwealth v. Baptista*, 32 Mass. App. Ct. 910, 911-912 (1992) (jury could reasonably infer defendant's fingerprints were deposited at time of crime where they were located on coin box inside locked vending machine, a surface not available to public). The telephone is

---

[30]Clearly there is no burden on the defendant to test or produce any evidence. See *Commonwealth v. Caputo*, 439 Mass. 153, 166 (2003). However, at this stage — a motion for a new trial — the defendant must establish that there is a reasonable possibility that the evidence would have made a difference in the jury's verdict. See *Commonwealth v. Healy*, 438 Mass. 672, 679 (2003). It is a fact that the defendant did not test the one fingerprint, and there is no reason to believe that his strategy would have been different had there been more fingerprints.

[31]In his brief, appellate counsel consistently characterizes the information relayed to trial counsel about the fingerprint as "inconclusive." Trial counsel never uses this word in his affidavit; he states that he knew that the print "could not be matched" to the defendant. Thus, the arguments that proceed on the basis that defense counsel never had "conclusive" information that the fingerprint did not match his client proceed from an inaccurate premise. References at trial to inconclusive test results referred only to chemical analysis of the defendant's saliva sample and the blood test results. See note 15, *supra.* See also *Commonwealth v. Laguer*, 65 Mass. App. Ct. 612, 621 (2006).

a frequently handled household instrument. Thus, given all of the circumstances in this case, including the fact that the defendant was aware at trial that the only fingerprint found on the telephone was not his, and the lack of any basis for assuming the other fingerprints would have identified a third party suspect, the defendant has not sustained his burden of showing that anything exculpatory has been withheld.[32]

Even were we to assume that the fingerprint report was exculpatory, we conclude that the defendant has not demonstrated that "a substantial basis exists for claiming prejudice from the nondisclosure." *Commonwealth* v. *Tucceri,* 412 Mass. 401, 412 (1992). We have nothing more than speculation that the nondisclosed fingerprints might have been those of another culprit. This, together with the powerful evidence that connected the defendant to the crime, compels the conclusion that the missing evidence would not have influenced the jury.

The victim consistently identified the defendant after spending several hours with him in adequate lighting. She had seen him before and thus could recognize him. (She explained her initial inability to provide information as caused by her fear of reprisal.) The victim's identification was supported by the fact that, when the police located the defendant in his apartment, he was wearing the same distinctive clothing as that described by the victim: jogging shorts, no shirt, and white "tube" socks with colored stripes. In addition, despite the fact that the attack occurred in the summer, it is not typical for people to walk outside with no footwear. This suggests strongly that the assailant lived within the same apartment building as the victim. The victim left her keys in her lock the day of the rape, and they were never located. The defendant's apartment is the only unit beyond the victim's on that floor, requiring the defendant to walk by the victim's apartment in order to reach his own. Thus, the jury could infer that the defendant had opportunity to obtain her keys. Furthermore, when the police first saw the defendant

---

[32]Nor did nondisclosure of the report hamper the defendant's contention that this was a case of misidentification. He made this point throughout trial in many different respects, e.g., by challenging the lighting in the victim's apartment, and by contesting her eyesight, physical condition, mental stability, and her reaction to medication.

two days after the incident, he had a "fresh" scratch across his back which was photographed, and the photograph was displayed to the jury. The victim was discovered with bloody fingernails and blood on one hand, and the jury could reasonably infer that the defendant's back was scratched by the victim during the attack. Moreover, the defendant provided differing explanations for the scratch.[33]

The Commonwealth's case was strengthened, too, by the weakness of the defendant's evidence. There were inconsistencies within his alibi defense, and that defense itself contrasted with his original statement to the police that he was at home during the attack. The defendant's testimony that he returned the victim's keys to her when he found them in her door was contradicted by the testimony of the victim that he had not done so.

The defendant contends that the existence of the fingerprint report would have helped to impugn the integrity of the police investigation. In this regard, trial counsel states in his affidavit that he would have questioned Detective Carignan concerning his efforts to match these prints to anyone else. But the same point was made in regard to the general nature of the police investigation, with many questions in cross-examination directed to its alleged inadequacy. In these circumstances, we are confident that it would not have influenced the jury had it been known that additional fingerprints on the telephone did not match those of the defendant. *Commonwealth* v. *Healy*, 438 Mass. 672, 679 (2003).[34]

As the Appeals Court noted, the impact of the failure to produce the fingerprint report is "markedly different" from that in cases where a new trial has been ordered because of the Commonwealth's failure to provide timely disclosure of evidence favorable to a defendant. *Commònwealth* v. *Laguer*, 65 Mass. App. Ct. 612, 622 (2006). See *Commonwealth* v. *Martin*, 427 Mass. 816, 823 (1998) (postmortem tests tending to

---

[33]The victim did state, however, that she did not recall scratching the rapist.

[34]In reaching this conclusion, we have not considered the fact that a deoxyribonucleic acid (DNA) test, performed after the trial at the defendant's request and conducted by an independent forensic scientist of the defendant's selection, apparently "pointed directly to the defendant's guilt." *Commonwealth* v. *Laguer*, 65 Mass. App. Ct. 612, 621 n.19 (2006).

disprove presence of drug in body of murder victim); *Commonwealth* v. *Gallarelli*, 399 Mass. 17, 22-24 (1987) (police report confirmed no trace of blood on knife seized from defendant on arrest for stabbing); *Commonwealth* v. *Bennett*, 43 Mass. App. Ct. 154, 158-163 (1997) (evidence tending to show defendant could not have made telephone calls to victim after attack because defendant was at that time detained in correctional facility); *Commonwealth* v. *Vaughn*, 32 Mass. App. Ct. 435, 439-440 (1992) (when detective indicated in initial report that there were two sets of footprints at crime scene but at trial testified that there were three sets of footprints, prosecution should have disclosed detective's change in statement).[35] In addition, see *Commonwealth* v. *Olszewski*, 401 Mass. 749, 755-757 (1988), *S.C.*, 416 Mass. 707 (1993), cert. denied, 513 U.S. 835 (1994) (no physical evidence linking defendant to murder and eight pieces of evidence lost or destroyed by the Commonwealth, including belt used to strangle victim that was same size as belt of defendant; blood samples from one crime scene; and initial written statement of witness who first exculpated defendant but later changed his story and became key Commonwealth witness). The Appeals Court correctly pointed out that the fingerprint report, unlike the items at issue in past cases, does not provide information that would have cast doubt on the victim's identification of the defendant or indicate that he did not commit this attack. *Commonwealth* v. *Laguer, supra.*

The defendant raises an additional and separate claim that the loss or destruction of the actual fingerprints and the back page of the fingerprint report violated his constitutional right to a fair trial pursuant to *Commonwealth* v. *Olszewski, supra.*[36] As we stated when this case came before us again following retrial,

---

[35]The defendant also seeks a new trial pursuant to Mass. R. Crim. P. 30 (b). After a careful review of the trial evidence, we conclude, for the reasons discussed above, that, to the extent there are any considerations under that rule that are not subsumed by our due process analysis, see *Commonwealth* v. *Tucceri*, 412 Mass. 401, 408-409 (1992), the trial judge properly denied the motion under rule 30 (b) as well.

[36]There is no question that some evidence has been lost or destroyed. Although the Commonwealth suggests, and it may well be, that there was never a second page to the fingerprint report, there obviously were fingerprints themselves located on the telephone that were tested by the State police and found not to match the defendant's fingerprints. The fingerprints have not

when evidence is lost or destroyed, "[a] defendant claiming to have been deprived of potentially exculpatory evidence has the initial burden of establishing a reasonable possibility, based on concrete evidence and not on mere speculation, that the Commonwealth's actions deprived him of evidence that would have been favorable to his case." *Commonwealth* v. *Olszewski*, 416 Mass. 707, 714 (1993), cert. denied, 513 U.S. 835 (1994). The first *Olszewski* opinion was not intended to, and does not, create a standard different from the due process analysis we have discussed above. That *Olszewski* opinion simply recognizes that the defendant's burden is more difficult when evidence is destroyed, and indicates that this is a factor to be considered. We have taken this factor into consideration in our analysis.[37] The defendant fails here for the same reason that we have discussed. He has not shown a reasonable possibility that the failure to disclose the fingerprint evidence "deprived him of evidence that would have been favorable to his case." Cf. *Commonwealth* v. *Olszewski, supra* at 714.

*Order denying motion for a new trial affirmed.*

been provided, and thus we proceed on the assumption that evidence has been lost or destroyed.

[37]The defendant maintains that, under *Commonwealth* v. *Olszewski*, 401 Mass. 749, 753 (1988) *S.C.*, 416 Mass. 707 (1993), cert. denied, 513 U.S. 835 (1994), when a claim of lost or destroyed evidence is made, the defendant need demonstrate only that the evidence is "potentially exculpatory," rather than actually exculpatory. The use of the different word was not intended to alter the legal analysis.