### COMMONWEALTH *vs.* THOMAS JUNTA.

No. 02-P-1340.

Middlesex. May 7, 2004. - September 23, 2004.

Present: GRASSO, DREBEN, & SMITH, JJ.

*Homicide. Practice, Criminal,* Discovery, Sentence. *Evidence,* Exculpatory, Photograph, Relevancy and materiality.

The criminal defendant in his motion for a new trial did not meet his burden of establishing the requisite substantial basis for a claim of prejudice from the Commonwealth's nondisclosure of evidence (an updated curriculum vitae of an expert witness and an abstract of a presentation given by that witness), where the abstract was not inconsistent with the witness's testimony, and where the testimony of percipient witnesses was more important to the conviction than the testimony of the various experts in the case [123-127]; moreover, the evidence did not qualify as newly discovered evidence, because it did not cast real doubt on the justice of the conviction and because telephone calls allegedly made to defense counsel during the course of the trial concerning the presentation and the abstract could and should have alerted defense counsel to the issues now raised [127].

At the trial of an indictment that included the lesser offense of involuntary manslaughter on a theory of unlawful killing by the commission of a battery, the judge did not err in admitting in evidence a photograph showing bruises that a witness who was not the victim in this case allegedly sustained when the defendant pushed her just prior to the altercation with the victim, where the photograph corroborated the witness's testimony and the judge therefore could exercise his discretion to find the photograph relevant and of probative value that outweighed its prejudicial effect; moreover, there was no error in the prosecutor's appealing, in closing argument, to the common sense of the jury in suggesting that bruises are not immediately visible but may take a day or two to appear. [127-128]

The judge sentencing a criminal defendant convicted of involuntary manslaughter on a theory of unlawful killing by the commission of a battery did not impermissibly consider uncharged conduct when, in expressing disappointment with the attempt of defense counsel to focus on the victim as culprit and with counsel's disingenuous description of the defendant's character, the judge remarked that he had recently learned that the incident in question had not been the first time that the defendant had struck another adult in front of minor children, where there was no indication that the judge punished the defendant for the earlier incident. [128-129]

INDICTMENT found and returned in the Superior Court Department on August 10, 2000.

The case was tried before *Charles M. Grabau*, J., and a motion for a new trial, filed on February 10, 2003, was heard by him.

*Brownlow M. Speer*, Committee for Public Counsel Services (*Bruce R. Bono*, Committee for Public Counsel Services, with him) for the defendant.

*Loretta M. Smith*, Assistant District Attorney (*Sheila M. Calkins*, Assistant District Attorney, with her) for the Commonwealth.

DREBEN, J. After an unfortunate fight between two fathers of pre-teen hockey players, one father, Michael Costin, died. The other, the defendant, was convicted by a jury of involuntary manslaughter on the theory of unlawful killing by the commission of a battery.[1] See *Commonwealth* v. *Nichypor*, 419 Mass. 209, 217 (1994). He was sentenced to six to ten years at M.C.I., Cedar Junction. His direct appeal and his appeal from the denial of his motion for a new trial were consolidated, and he claims: (1) that the Commonwealth's violations of its discovery obligations denied him access to significant exculpatory evidence under the rule of *Brady* v. *Maryland*, 373 U.S. 83 (1963); (2) that a photograph admitted in evidence showing bruising of a third person was irrelevant and prejudicial and, together with improper argument of the prosecutor, created a substantial risk of a miscarriage of justice; and (3) that his sentence must be vacated because the judge improperly considered uncharged conduct in imposing the sentence. We affirm the conviction and the order denying the new trial motion.

1. *Facts.* On the afternoon of July 5, 2000, the defendant took his ten year old son and two friends to the Burbank Ice Arena in Reading for "stick practice," an informal hockey practice. The defendant, watching from the stands, considered the play too rough, went down to the ice, and complained to Costin, who was playing with his three sons. Costin's response was, "That's hockey." The men exchanged words. Shortly thereafter, when the players were changing out of their hockey gear in the locker rooms, the defendant and Costin continued to argue and began to struggle physically. Other adults broke up

---

[1] The trial judge charged the jury on voluntary manslaughter as well as involuntary manslaughter.

the fight. The defendant left the building, leaving his son to finish changing in the locker room. He returned a few minutes later, at which time, according to Nancy Blanchard, a rink employee, he appeared angry. She tried to stop him from entering, but allegedly he pushed her aside into a wall, causing her arm to bruise. The defendant encountered Costin, and the two immediately began throwing punches at one another.

There was conflicting testimony at trial: the defendant claimed he was attacked first, while prosecution witnesses said the defendant grabbed Costin first. In any event Costin, who weighed approximately 160 pounds, ended up on the ground with the defendant, who weighed about 270 pounds, straddled on top of him. Costin was punched on the face and elsewhere.

At issue was the number of blows inflicted — Blanchard and others testified that Costin was punched "many, many times"; the defendant and his witnesses claimed "two or three." Blanchard and another witness each yelled to the defendant to stop, screaming, "you're going to kill him."

Costin did not succumb immediately to the blows, and, according to several witnesses, there was a period during the punching that he was moving, fighting, kicking, or flailing. By the time the defendant was pulled from Costin by bystanders, the latter was motionless. He was treated by emergency medical technicians and an advanced life support team and was taken to a hospital, where he died the next day.

The number of blows inflicted was viewed as crucial by the defense. "The law of this Commonwealth recognizes unlawful-act manslaughter only if the unlawful act is a battery not amounting to a felony, when the defendant knew or should have known that the battery he was committing endangered human life." *Commonwealth* v. *Sires*, 413 Mass. 292, 302 n.10 (1992). See *Commonwealth* v. *Nichypor*, 419 Mass. at 217. Thus, if only a single punch or only minor blows were involved, this would tend to negate the defendant's knowledge or imputed knowledge that he was endangering human life.

The expert testimony of the prosecution and the defendant differed as to the number of blows. Dr. Stanton Kessler of the Commonwealth's office of the chief medical examiner was an expert for the prosecution. He had performed the autopsy and

described the numerous injuries on Costin's body, with particular focus on major trauma to the neck and head.[2] According to his testimony, there were two areas of severe trauma, one to the base of the neck where the vertebral artery ruptured, cutting off one-fourth of the blood supply to the brain, and internal trauma to the left side of the head above the ear. This second injury, totally unrelated to the rupture of the vertebral artery, resulted in "severe" and "serious" bleeding of the brain: a brain cavity remote from the neck "was shaken up so badly that these little vessels tore and bled deep in the brain."

The cause of death, in Dr. Kessler's opinion, was "blunt head and neck trauma, contributory factor of bronchopneumonia" (fluid in the lungs). In his opinion there were multiple blows. Although he acknowledged several times that the injury to the vertebral artery could possibly have been sustained because of one blow, there was here tearing of the ligaments "almost tearing the head from the neck," indicating multiple blows.

The defense expert, Dr. Ira Kanfer, believed that the cause of death was rupture of the vertebral artery, a rare injury caused by minimal force, and that this had been caused by a single blow.

2. *Discovery issues.* In connection with its motion for a new trial, the defense filed the affidavit of Melissa Christie, an organ donation coordinator who worked at the office of the chief medical examiner. She had, during trial, unsuccessfully attempted to communicate with the defense. She alleged that she had attended a conference of forensic examiners in Seattle, Washington, where Dr. Kessler had given a presentation on the technique for evaluating vertebral artery traumas. At that time Dr. Kessler "identified the case for the audience as being the famous 'Hockey Dad's' case in Massachusetts," and showed slides of Costin's injuries, stating they were slides of the victim's body. He identified the vertebral artery rupture as the

---

[2]In total, he found fifteen areas of trauma, among them an "abrasion on his cheek with swelling around it for about two inches," "profuse swelling and bruising . . . surround[ing] the entire [left] ear," a contusion over the left eyebrow, an abrasion of the right cheek, a bruise on the nose, a "large area of hemorrhage in the muscle" under the skin of the left shoulder, abrasions on the hands, a "most deep bruise . . . [a] hemorrhage in the muscle" in the mid-lower back, and a hemorrhage in the right side of the buttock. He acknowledged that one blow could cause more than one area of trauma.

fatal injury, which he said was the result of a blow to the neck when it was hyperextended. He also indicated that the injury can occur very easily during a visit to a chiropractor's office, but according to Christie, "[t]here was nothing in his talk about substantial force or multiple blows having caused the rupture of Mr. Costin's vertebral artery."[3] Appended to her affidavit was a copy of an abstract of the presentation, a joint paper by Dr. Kessler and another physician.[4]

Before any witnesses testified, the defendant filed a motion in limine to preclude Dr. Kessler from testifying to an opinion "concerning the degree, amount or manner of force necessary to cause or alleged to have been involved in the trauma to Michael Costin." The Commonwealth had violated a pretrial discovery order to "provide to the defendant a list of its experts, their curriculum vitae, opinion, and basis for the opinion five days before trial." The judge, however, found that there was no surprise as the Commonwealth's theory had been presented by Dr. Kessler before the grand jury.[5]

Based on the Christie affidavit and the abstract, the defendant claims that the prejudice from the judge's ruling only became apparent when the record was expanded to include the material submitted in support of the motion for a new trial. The Commonwealth's violations of discovery orders — failing to provide an updated curriculum vitae[6] listing the abstract and failing to

[3]Christie also alleged that she watched the proceedings of the trial on television and "[w]hen [Dr. Kessler] testified about substantial force and multiple blows to the victim being the cause of the rupture of the victim's vertebral artery, I was astounded, because this was completely opposite to what he had told me and what he had said in his presentation at the . . . conference."

[4]In his memorandum of decision denying the motion for a new trial, the trial judge pointed out that the abstract does not mention the Massachusetts case and that although "[the defendant] contends that he would have used Dr. Kessler's 'presentation,' there is no evidence before me that his presentation at the February 2001 [c]onference was recorded."

[5]The defendant has not provided us with the grand jury minutes, and hence we cannot compare them to the trial transcript. We note, however, from the cross-examination of Dr. Kessler that his opinion at trial appears to have been consistent with his grand jury testimony.

[6]The prosecution in fact provided defense counsel with an updated copy of Dr. Kessler's curriculum vitae on the morning of his testimony. There were

provide the abstract itself — the defendant urges, denied him access to highly exculpatory evidence.

Due process is violated under *Brady* v. *Maryland*, 373 U.S. at 87, if the prosecution fails to produce "evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." *Commonwealth* v. *Healy*, 438 Mass. 672, 679 (2003), quoting from *Commonwealth* v. *Ellison*, 376 Mass. 1, 22 (1978). Assuming that the "defendant specifically requested the evidence that was not disclosed, 'a standard of prejudice more favorable to the defendant is justified.' *Commonwealth* v. *Tucceri*, [412 Mass. 401, 407 (1992)]. In such circumstances, 'a defendant need only demonstrate that a substantial basis exists for claiming prejudice from the nondisclosure.' *Id.* at 412." *Commonwealth* v. *Healy*, 438 Mass. at 679-680 (footnote omitted). The defendant, however, has the burden of establishing the requisite "substantial basis" for the claim of prejudice. *Id.* at 680.

After examining Dr. Kessler's testimony and the abstract, we conclude, as did the motion judge (who was also the trial judge), that the defendant has not met his burden. The abstract is not inconsistent with Dr. Kessler's testimony, and, moreover, the defendant overstates the factual importance of the experts' testimony in this case. Although the defendant urges that Dr. Kessler testified that multiple blows caused the rupture of the vertebral artery, he did not so testify. What led him to the conclusion of multiple blows was the fact that there were also other injuries including "the injury in the middle of the brain."[7] He stated, "Taking into account the tearing of the small vessels

---

conflicting affidavits as to whether the Commonwealth had pointed out to the defense the addition of the abstract to the curriculum vitae, but the judge declined to decide the question because "[e]ven assuming all of the facts alleged by [the defendant] are true, [he] has failed to show that the Commonwealth's nondisclosure of Dr. Kessler's [a]bstract caused him prejudice."

[7]As noted earlier, Dr. Kessler found not just the rupture of the vertebral artery but also a second area of "severe" and "serious" bleeding in the brain.

The defendant in his brief attempts to show another inconsistency between the abstract and Dr. Kessler's testimony. He quotes the abstract: "To make

in the cavity of the brain we call the ventricle. Taking into account the amount of blood and tearing of the vertebral artery and the bruising and hemorrhage in the vertebral arteries on both sides. And the hemorrhage in the neck. This is a substantial force injury. It takes a lot of trauma to tear ligaments and the ligaments at the back of the skull are torn and hemorrhaged." That the abstract reported that tearing of the vertebral artery may typically be caused by minor blows in no way contradicts Dr. Kessler's testimony that due to the severity of the injuries in this case, multiple blows were here inflicted.

Perhaps even more important, the testimony of the percipient witnesses belied the claim of one or minimal blows. No witness testified that the defendant hit Costin only once, and the defendant himself testified that there were two or three punches. Both experts pointed out that once the vertebral artery is ruptured, the victim would within seconds become unconscious or brain dead. As the trial judge pointed out in his well-reasoned memorandum denying a new trial,

> "there was substantial eyewitness testimony that the victim was still moving after a minimum of two punches. There was also substantial testimony from eyewitnesses that [the defendant] punched the victim anywhere from three up to

this diagnosis [of traumatic rupture of the vertebral artery] there must not be any other traumatic injury to the brain, dural coverings, spinal cord, or skull." The full quote is:

> "There have been numerous reports in the recent forensic pathology literature discussing traumatic basilar subarachnoid hemorrhage, secondary to vertebral artery injuries. To make this diagnosis there must not be any other traumatic injury to the brain, dural coverings, spinal cord, or skull."

In adding the bracketed material, the defendant changed the meaning. The diagnosis referred to in the abstract is *traumatic basilar subarachnoid hemorrhage, secondary to vertebral artery injuries*, rather than the diagnosis of injury to the vertebral artery itself. That this is what was meant was borne out at trial.

Dr. Kanfer found no evidence in the autopsy of violent shaking of the brain because what "one usually sees is (1) subarachnoid hemorrhage, which we don't see here," thus indicating that such shaking, as described by Dr. Kessler, would also cause subarachnoid hemorrhaging. On cross-examination, Dr. Kanfer, when asked whether the autopsy photographs depicted subarachnoid hemorrhage, answered, "Yes."

ten or more times. Therefore, the information contained in Dr. Kessler's [a]bstract would not have provided [the defendant] with effective impeachment material." (Footnotes omitted.)

3. *Newly discovered evidence.* "A defendant seeking a new trial on the ground of newly discovered evidence must establish both that the evidence is newly discovered and that it casts real doubt on the justice of the conviction." *Commonwealth* v. *Grace,* 397 Mass. 303, 305 (1986). This standard requires a greater showing of the likelihood of prejudice than the standard set forth in *Commonwealth* v. *Healy,* 438 Mass. at 679-680, applicable when evidence is not disclosed by the prosecution despite a specific request. Accordingly, the claim based on newly discovered evidence is disposed of by our previous discussion. Moreover, we note that the judge considered that the numerous phone calls allegedly made by Christie to defense counsel during the trial "could and should have alerted the defense team to the issues they now raise," thus negating the claim that the evidence was "newly discovered," that is, not previously available.

4. *Admission of photograph showing bruising of Nancy Blanchard's arm.* The defendant argues that while Blanchard's testimony was admissible to show the defendant's frame of mind as he reentered the building and allegedly pushed her aside, see *Commonwealth* v. *Bray,* 19 Mass. App. Ct. 751, 757 (1985), the photograph showing her bruises was irrelevant, prejudicial, and only served the improper purpose of showing "that the defendant had a violent character or a general propensity for violence." *Ibid.* The photograph, however, corroborated Blanchard's testimony. It was within the discretion of the trial judge to find it relevant and of probative value outweighing its prejudicial effect. *Commonwealth* v. *Ortiz-Soto,* 49 Mass. App. Ct. 645, 648 (2000). There was no error, let alone a substantial risk of a miscarriage of justice, in its admission,[8] or in the prosecutor's appealing, in closing argument, to the common sense of the jury in suggesting that bruises are not

---

[8]Although the defendant objected to the admission of the photograph at trial, the objection was based on an alleged discovery violation and not on the ground argued on appeal. Accordingly, we review the claim to determine

immediately visible but may take a day or two to appear. No expert medical testimony was required to support this argument.

5. *Sentencing.* In sentencing the defendant to six to ten years at M.C.I., Cedar Junction, the judge, finding aggravating circumstances,[9] exceeded the nonbinding sentencing guidelines. The sentence, however, was well within the statutory maximum of twenty years. See G. L. c. 265, § 13.

The defendant argues that the judge imposed a "draconian" sentence because he impermissibly considered uncharged conduct — a 1991 incident in which the defendant's wife petitioned a District Court for protection from domestic abuse.[10] At the beginning of the sentencing hearing, the defendant filed a motion to preclude the Commonwealth from mentioning the incident, but the judge ruled otherwise, citing *Commonwealth* v. *Goodwin*, 414 Mass. 88 (1993). He also stated that he would make reference to the incident in his sentencing memorandum when he read it into the record, adding, "But it played a very, very small factor in my disposition, Mr. [defense counsel]. I make reference to it. I allude to it only to explain my disappointment as to a certain aspect of the case. I'll leave it at that."

In his sentencing memorandum, the judge indicated his disappointment with the attempt of defense counsel to focus on the victim as culprit and counsel's disingenuous description of the

---

whether the alleged error created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Rivera*, 425 Mass. 633, 636-637 (1997).

[9]The judge in his sentencing memorandum, which he also read in open court, mentioned the following as aggravating circumstances. "The evidence presented at trial was that this crime occurred at a skating rink in the middle of the afternoon on July 5, 2000. Minor children and several adults witnessed the defendant repeatedly strike Mr. Costin which resulted in his death. Three of Mr. Costin's four children witnessed their father beaten to death. [The defendant's son], then 10 years old, also saw his father beat a man to death. This incident lasted for a sufficient period of time to allow several witnesses the opportunity to scream or yell to [the defendant] to stop beating Mr. Costin. As a result of this crime, Mr. Costin, then 40 years old and a single father, is dead." The judge then mentioned the family members, including Costin's children, who had been deprived of Costin's society.

[10]In that action, the defendant's wife stated in an affidavit, "Physical [and] verbal abuse caused to me by my husband. . . . During this time my [two] small children and a small girlfriend watch[ed] as my husband was hitting me contin[uously]. He was telling my children don't worry kids it will be O.K."

defendant's character. He then noted that he "recently learned that the July 5, 2000 incident at the Burbank Arena was not the first time that [the defendant] struck another adult in front of minor children." It was in this context that the judge cited the 1991 incident and quoted the defendant's wife's affidavit.

In *Commonwealth* v. *Goodwin*, 414 Mass. at 92, the court held that a judge, in assessing the several goals of sentencing, "may consider many factors which would not be relevant at trial including hearsay information about the defendant's character, behavior, and background." While " 'a sentencing judge may not undertake to punish the defendant for any conduct other than that for which the defendant stands convicted' . . . Massachusetts decisions have recognized the relevance at sentencing of reliable evidence of the defendant's prior misconduct." *Id.* at 93, quoting from *Commonwealth* v. *LeBlanc*, 370 Mass. 217, 221 (1976). Contrary to the defendant's contention, we see no indication that the judge punished the defendant for the 1991 incident.[11]

The defendant's claim that the G. L. c. 209A materials were not sufficiently reliable to be considered by the judge is without merit. "If the defendant heard allegations by the Commonwealth which he considered false, we would expect that he would have tried to rebut them." *Commonwealth* v. *Settipane*, 5 Mass. App. Ct. 648, 656 (1977). The burden was on the defendant to show their unreliability. *Ibid.*

*Judgment affirmed.*

*Order denying motion for new trial affirmed.*

---

[11]The recent United States Supreme Court decision in *Blakely* v. *Washington*, 124 S. Ct. 2531 (2004), has no application here, as the Massachusetts sentencing scheme provides for indeterminate sentences. See *id.* at 2538, citing *Williams* v. *New York*, 337 U.S. 241 (1949).