Thomas **JUNTA,** Petitioner

v.

Michael **THOMPSON,** Respondent.

Civil Action No. 06–10280–RCL.

United States District Court, D. Massachusetts.

Aug. 25, 2009.

Chauncey B. Wood, Wood & Nathanson, LLP, Boston, MA, for Petitioner.

James J. Arguin, Office of the Attorney General, Boston, MA, for Respondent.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

## I. INTRODUCTION

The petitioner Thomas Junta ("Junta") seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254. *See* Petition for Writ of Habeas Corpus ("Petition") [Doc. No. 1–1]. Junta is in the custody of the respondent Michael Thompson [1] ("Thompson"), having been convicted

---

1. Thompson is the superintendent of the Massachusetts Correctional Institution located in Shirley, Massachusetts. *See* Petition at 1.

of involuntary manslaughter. Petitioner's Memorandum of Law in Support of Petition for Writ of Habeas Corpus ("Pet'r Mem.") at 2 [Doc. No. 7]. Junta contends that he is entitled to habeas relief on but one ground; riz., the prosecution failed to disclose prior writings and statements inconsistent with the trial testimony of Dr. Stanton Kessler ("Dr.Kessler"), the chief medical examiner who performed the autopsy on the decedent Michael Costin ("Costin"). *See id.* at 1. Junta argues that this evidence could have been used to impeach Dr. Kessler's trial testimony regarding the cause of death, and thus, the suppression of this information was a violation of the Due Process Clause of the Fourteenth Amendment as set forth in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Id.* He further argues that the Massachusetts Appeals Court unreasonably applied *Brady* when it affirmed his conviction for involuntary manslaughter. *See id.* at 27–28; *Commonwealth v. Junta,* 62 Mass.App.Ct. 120, 815 N.E.2d 254 (2004).

## II. FACTS

On the afternoon of July 5, 2000, Junta took his ten-year old son, and two of his son's friends, to "stick practice"[2] at the Burbank Ice Arena in Reading, Massachusetts. *Junta,* 62 Mass.App.Ct. at 121, 815 N.E.2d 254. During the session, Junta remained in the stands. *See id.* Costin was one of only two adults who participated in the session, and was in attendance with his three sons. *See id.* After watching the practice for a period of time, Junta determined that the game had become too rough. *Id.* As a result, he went down to ice-level and complained to Costin. *Id.* Costin's response to Junta, however, was "That's hockey." *Id.* The men exchanged

words, but there was no physical altercation at that time. *See id.*

The practice ended shortly thereafter and all participants proceeded from the ice to their respective locker rooms. *See id.* While the participants were changing out of their hockey gear in the locker rooms, Junta and Costin again confronted one another. *Id.* What began as an argument quickly turned into a physical struggle, which was ultimately broken up by other nearby adults. *Id.* at: 121–22, 815 N.E.2d 254. Junta subsequently walked outside the arena and left his son to finish changing in the locker room. *Id.* at 122, 815 N.E.2d 254. Before his son finished changing, however, Junta went back inside. *Id.* Upon his return, arena employee Nancy Blanchard stated that Junta "appeared angry." *Id.* She attempted to keep Junta from re-entering the arena, but he allegedly pushed her aside into a wall causing her arm to bruise. *Id.* Junta then found Costin and another physical altercation ensued with both men throwing punches at the other. *Id.*

There was conflicting testimony at trial regarding which man was the first aggressor. *See id.* Junta claimed that Costin attacked him first, while witnesses for the Commonwealth asserted that it was Junta who grabbed Costin. *Id.* Despite this conflicting testimony, all parties agreed that Costin—who weighed approximately 160 lbs.—wound up on the ground with Junta-who weighed approximately 270 lbs.—straddled on top of him. *Id.* Further, all parties were in agreement that Costin was punched numerous times in the face and elsewhere. *Id.*

Costin did not immediately succumb to Junta's blows. *Id.* To the contrary, according to numerous witnesses, "there was

---

**2.** "Stick practice" is colloquially understood to mean "an informal hockey practice." *See*

*Junta,* 62 Mass.App.Ct. at 121, 815 N.E.2d 254.

a period during the punching that he was moving, fighting, kicking, [and] flailing." *Id.* By the time that Junta was pulled away from Costin, however, Costin laid motionless. *Id.* Emergency medical technicians were thereafter called and immediately responded. *See id.* The technicians quickly transported Costin to a nearby hospital. *Id.* Despite receiving immediate medical attention, Costin passed away the next day. *Id.*

## III. PROCEDURAL POSTURE

On August 10, 2000, a Middlesex County grand jury returned a single-count indictment against Junta. Respondent's Opposition to Petition for Writ of Habeas Corpus ("Resp't Mem.") at 5 [Doc. No. 9]. The indictment charged that Junta committed manslaughter in violation of Mass. Gen. Laws ch. 265, § 13. *Id.* On January 11, 2002, following a trial, Junta was convicted by a Massachusetts Superior Court jury of involuntary manslaughter. *Junta,* 62 Mass.App.Ct. at 121, 815 N.E.2d 254. The theory upon which conviction was based was the unlawful killing of another by the commission of a battery. *Id.* As a result of his conviction, Junta was sentenced to serve ten years at the Massachusetts Correctional Institution—Cedar Junction. *Id.*

Junta subsequently filed a motion for new trial on the ground that the prosecution failed effectively to disclose an updated curriculum vitae ("CV") for Dr. Kessler, an abstract he authored, as well as a speech he delivered at a recent academic conference. Resp't Mem. at 5. The trial judge denied Junta's motion without an evidentiary hearing. *Id.* Junta then appealed the denial of his motion for new trial, which was consolidated by the Appeals Court with the direct appeal of his conviction. *See Junta,* 62 Mass.App.Ct. at 121, 815 N.E.2d 254. On September 23, 2004 the Appeals Court affirmed Junta's

conviction and denied his motion for new trial. *See id.* at 129, 815 N.E.2d 254. The court held that the abstract written by Dr. Kessler was not inconsistent with his testimony, and thus, would not have been "effective impeachment material." *Id.* at; 127. Junta thereafter filed with the Massachusetts Supreme Judicial Court an application for leave to obtain further appellate review, which the court ultimately denied. Resp't Mem. at 5.

## IV. ANALYSIS

### A. Standard for Granting Federal Habeas Relief

This Court is permitted to review Junta's state court convictions "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The scope of this Court's review of Junta's petition must be "both limited and highly deferential" to the state court judgments. *Evans v. Thompson,* 465 F.Supp.2d 62, 66 (D.Mass.2006).

There is no dispute that Junta has exhausted all available state court remedies. As such, this Court is permitted to grant his petition for writ of habeas corpus if it finds that the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court [,]" or a "decision that was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d).

The Supreme Court has emphasized that "contrary to" and "unreasonable application" are independent bases for granting habeas relief. *See Williams v. Taylor,* 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In order for a state court's decision to be reviewable because it was "contrary to" clearly established fed-

eral law, the decision must be "substantially different" from the relevant Supreme Court precedent. *Id.* "[T]he word 'contrary' is commonly understood to mean 'diametrically different' or 'mutually opposed.'" *Id.* Essentially, a state court decision is "contrary to" Supreme Court precedent if it contradicts that decision or reaches a different result on facts that are materially indistinguishable. *Id.*

In assessing whether a state court decision involves "an unreasonable application of ... clearly established" federal law, 28 U.S.C. § 2254(d), the focus is on "whether the state court's application of federal law was objectively unreasonable." *Williams,* 529 U.S. at 409, 120 S.Ct. 1495. Essentially, a federal habeas court is permitted to grant habeas relief under the "unreasonable application" prong "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."[3] *Id.*

Lastly, the phrase "clearly established Federal law ... refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412–13.

In sum, habeas relief is not warranted if the state court's decision was merely erroneous or incorrect; it must be "objectively unreasonable." *Woodford v. Visciotti,* 537 U.S. 19, 24, 27, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam).

### B. The *Brady* Standard

In determining whether habeas relief is appropriate, this Court is required to determine whether the state court has unreasonably applied federal law "as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Supreme Court jurisprudence applicable to the case at bar is *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. This line of cases established the standard for determining whether the prosecution's suppression of evidence has violated the Due Process Clause of the Fourteenth Amendment. *See id.* at 87, 83 S.Ct. 1194.

In *Brady,* the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* The Court elaborated on this standard in *Strickler v. Greene,* holding that there are three components to a *Brady* violation. 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Thus, the Court held that *Brady* has not been violated unless: (1) the evidence at issue was favorable to the accused; (2) the evidence was effectively suppressed by the prosecution; and (3) the accused has suffered prejudice resulting from the prosecution's suppression of the evidence. *Id.* at 281–82, 119 S.Ct. 1936.

The Court further explained how each prong of the *Brady* standard can be established. First, the Court explained that evidence is "favorable" to the accused where "it is [either] exculpatory, or ... it is impeaching." *Id.* at 282, 119 S.Ct. 1936. Second, suppression of evidence by the prosecution occurs whether it was done so "willfully or inadvertently...." *Id.* Last, the accused will only be found to have suffered prejudice where "the nondisclo-

---

**3.** The Supreme Court has stressed that under the "unreasonable application" prong, "the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams,* 529 U.S. at 410, 120 S.Ct. 1495 (emphasis in original).

sure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* at 281, 119 S.Ct. 1936.

In the present case, Junta asserts that the Massachusetts Appeals Court unreasonably applied the aforementioned standard to the facts of his case. He argues that it was unreasonable for the court to hold that the prosecution's failure to supply Dr. Kessler's abstract was not a violation of *Brady*. Furthermore, he contends that the court did not adequately address his claim that Dr. Kessler's presentation at a conference of the American Academy of Forensic Sciences (the "conference") was exculpatory evidence, and thus, was withheld by the prosecution in violation of *Brady*. As such, Junta urges this Court to review *de novo* the issue of Dr. Kessler's presentation delivered at the conference.

## C. The Massachusetts Appeals Court's Application of *Brady*.

In reviewing Junta's conviction, the Massachusetts Appeals Court explained that the Due Process Clause has been violated in a criminal prosecution if the Commonwealth fails to produce "evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." *Junta*, 62 Mass.App.Ct. at 125, 815 N.E.2d 254 (quoting *Commonwealth v. Ellison*, 376 Mass. 1, 22, 379 N.E.2d 560 (1978)). Although this is an accurate representation of the *Brady* rule, the court took a rather abbreviated approach in applying this analysis to the facts of Junta's case.

Junta correctly points out that the court did not explore in depth many of the issues raised by the defense, including whether the CV was effectively suppressed by the Commonwealth and whether the prosecution had an obligation to discover information known only by an expert witness. The court's analysis, however, was not an *unreasonable* application of clearly established federal law. After reciting the evidence that was not disclosed, or belatedly disclosed, the court held that none of it could have been used to impeach Dr. Kessler because it was not inconsistent with his trial testimony. *Junta*, 62 Mass. App.Ct. at 125, 815 N.E.2d 254. Thus, it was unnecessary for the court to go through the other steps of the *Brady* analysis.

The issue of whether Dr. Kessler's presentation at the conference constituted exculpatory evidence, however, stands on different grounds. The Massachusetts Appeals Court's opinion did not adequately address this issue. Thus, this Court will consider it *de novo*. *See Fortini v. Murphy*, 257 F.3d 39, 47 (1st Cir.2001).

## 1. The Massachusetts Appeals Court's Analysis of Dr. Kessler's Updated CV.

As Dr. Kessler took the stand during Junta's trial, the prosecution furnished defense counsel with a copy of Dr. Kessler's updated CV. *Junta*, 62 Mass.App.Ct. at 124–25 n. 6, 815 N.E.2d 254. In the CV, Dr. Kessler indicated that he had written an abstract and gave a presentation to the American Academy of Forensic Sciences on the subject of vertebral artery rupture. The Massachusetts Appeals Court offered only a brief review of the Commonwealth's delayed disclosure of this evidence, stating simply that the CV *was* disclosed to the defense. *Junta*, 62 Mass.App.Ct. at 124 n. 6, 815 N.E.2d 254. The updated CV, however, is not at the core of Junta's claim. In fact, Junta has never argued that the delayed disclosure of the CV, on its own,

was a violation of the Due Process Clause under *Brady*. He contends only that the delayed disclosure of the CV effectively suppressed the written abstract and the conference presentation. *See* Pet'r Mem. at 1. Thus, it was not unreasonable for the Massachusetts Appeals Court to omit a *Brady* analysis of the CV.

### 2. The Massachusetts Appeals Court's Analysis of the Abstract.

■ Prior to his testimony, Dr. Kessler gave a presentation at an annual forensic sciences conference regarding traumatic rupture of the vertebral artery—one of Costin's injuries. *See id.* at 13. Accompanying his presentation was a written abstract entitled "Through the Tight Canal Swiftly—A Review of the Technique for Evaluating Vertebral Artery Trauma at Autopsy." *Id.* This abstract was not disclosed by the prosecution, but was noted on Dr. Kessler's updated CV. *See Junta,* 62 Mass.App.Ct. at 124-25, 815 N.E.2d 254. The contents of the abstract and how it compared to Dr. Kessler's testimony was the primary focus of the Massachusetts Appeals Court's decision. The court noted that Dr. Kessler's writings indicated his opinion that the "tearing of the vertebral artery may typically be caused by *minor* blows." *Id.* at 126, 815 N.E.2d 254. Junta argued on appeal that the contents of the abstract were inconsistent with Dr. Kessler's testimony that Costin's fatal rupture of the vertebral artery was caused by "multiple blows." The Appeals Court considered this an inaccurate characterization of the facts. *Id.* at 125, 815 N.E.2d 254. In its opinion, the Appeals Court stated that Dr. Kessler's trial testimony that Junta hit Costin multiple times was based upon the fact that Costin had numerous other injuries besides the ruptured artery. *Id.* at 126 n. 7, 815 N.E.2d 254. The court quoted Dr. Kessler's trial testimony that there were fifteen areas of trauma on Cos-

tin, including an "abrasion on his cheek[,] profuse swelling and bruising sur-round[ing] the entire ear" and injuries on his back, shoulder and buttock. *Id.* at 123 n. 2, 815 N.E.2d 254.

Dr. Kessler indicated at trial that in forming his opinion, he took "into account the tearing of the small vessels in the cavity of the brain[,] the amount of blood and tearing of the vertebral arteries on both sides[, as well as] the hemorrhage to the neck." *Id.* at 125–26, 815 N.E.2d 254. Based upon this data, Dr. Kessler concluded that Costin sustained a "substantial force injury." *Id.* at 126, 815 N.E.2d 254. Dr. Kessler further opined that "[i]t takes a lot of trauma to tear ligaments and the ligaments at the back of [Costin's] skull [were] torn and hemorrhaged." *Id.* He also testified, however, that the injury to the vertebral artery alone *"could possibly* have been sustained because of one blow." *Id.* at 123, 815 N.E.2d 254. (emphasis added).

Based upon its review of the record, the Appeals Court concluded that the written abstract in no way contradicted Dr. Kessler's trial testimony. *Id.* at 126, 815 N.E.2d 254. In both the abstract and his testimony, Dr. Kessler explained that a fatal injury to the vertebral artery can be caused by only one minor blow. Moreover, the abstract did not speak to Junta's case specifically, and thus, would not be inconsistent with Dr. Kessler's testimony that in *this* case Costin's injuries were the result of multiple blows and substantial force. The Appeals Court's holding that the abstract was not inconsistent therefore satisfies the *Brady* test because the evidence was neither impeaching nor exculpatory. Accordingly, the court's brief analysis of the abstract was not an unreasonable application of *Brady.*

### 3. The Massachusetts Appeals Court's Analysis of Dr. Kessler's Conference Presentation.

■ Junta contends that the Massachusetts Appeals Court did not properly address the issue of whether the suppression of Dr. Kessler's presentation was a violation of due process as set forth in *Brady.* He now asks this Court to review the matter *de novo.* As stated above, under the controlling statute, a federal court must review the prior state court opinion and determine whether there was been an unreasonable application of federal law. 28 U.S.C. § 2254(d). This standard of review, however, applies only to claims that were "adjudicated on the merits in the state court proceedings." *Id.* In situations where the state court failed to address a specific federal issue, the reviewing court is not required to grant this type of deference. *See Fortini,* 257 F.3d at 47 ("[W]e can hardly defer to the state court on an issue that the state court did not address.").

To be fair, the Appeals Court did address the evidence relating to Dr. Kessler's conference presentation briefly. Nevertheless, it declined to analyze the materiality of the evidence because the conference presentation was never recorded. *Junta,* 62 Mass.App.Ct. at 124 n. 4, 815 N.E.2d 254. This was an insufficient review of the evidence and this Court necessarily must conduct its own analysis.

In February 2001, Dr. Kessler gave a presentation at a conference on forensic science. As part of his presentation, Dr. Kessler discussed the work he performed during Costin's autopsy. This Court has before it an affidavit from a conference attendee, Melissa Christie—the donation coordinator for the New England Eye and Tissue Transplant Bank. Citing Ms. Christie's statements concerning what Dr. Kessler said at the conference, Junta argues that Dr. Kessler's presentation regarding the amount of force and the number of blows was inconsistent with his trial testimony. Ms. Christie stated that when Dr. Kessler presented the "famous 'Hockey Dad's' case" he showed slides of Costin's body and described how he was able to pinpoint the location of the ruptured vertebral artery, which was the fatal injury. *See* Pet'r Mem. at 13. He went on to point out that this was "an injury that can occur very easily at the chiropractor's." *Id.* Ms. Christie stated that at no point did Dr. Kessler clarify that, in contrast, Costin's injury came from the use of substantial force and multiple blows. *Id.*

Junta bases his argument that Dr. Kessler's presentation was inconsistent with his trial testimony on what Dr. Kessler *did not* say, and not on what he did say. Junta claims that Dr. Kessler's failure to mention the use of "substantial force" on Costin rendered his conference presentation "a prior inconsistent statement." *Id.* at 21.

■ Contrary to Junta's contention, there was no actual inconsistency between Dr. Kessler's conference statements and his trial testimony. It is true that a court may find inconsistency with trial testimony should a witness fail make a statement under circumstances in which it would be logical to make the statement. *See Commonwealth v. Kindell,* 44 Mass.App.Ct. 200, 204, 689 N.E.2d 845 (1998). This, however, is not the case here.

A pamphlet was provided to all conference attendees, which included Dr. Kessler's abstract. The abstract explained that "[a]fter attending this presentation the participant will understand: (1) the clinical presentation of traumatic rupture of the vertebral artery, (2) the method to achieve excellent postmortem angiography, and (3) the techniques for best exposing

the vertebral artery in-situ." Although at some point in the lecture Dr. Kessler allegedly informed attendees that the type of injury suffered by Costin could be caused by only minimal force, Ms. Christie's affidavit suggests that the bulk of Dr. Kessler's lecture was focused on the various techniques he utilized in performing the autopsy of those deceased persons who suffered from a vertebral artery trauma. Ms. Christie states that "[h]e spoke at length about the dissection of the vertebral artery and how dye had been injected to pinpoint the exact location of the rupture." Pet'r Mem. at 13. Viewing the abstract and Ms. Christie's affidavit together, the nature of Dr. Kessler's conference presentation was such that it would not necessarily be logical for him to further elaborate on the exact cause of Costin's death. The fact that he failed to make this specific clarification does not give the presentation the character of a prior inconsistent statement.

Given that the primary purpose of Dr. Kessler's presentation was to demonstrate techniques used in performing an autopsy, it would have been natural for him to omit details about the specific circumstances surrounding Costin's death. Moreover, Dr. Kessler made statements both during his trial testimony and in his testimony before the grand jury that were similar in nature to those he made at the conference. His expert opinion that a fatal injury to the vertebral artery is sometimes caused by minimal force has been unwavering. Dr. Kessler's conference statements, or lack thereof, do not rise to the level of materiality that would create a "reasonably probability of a different result" had the presentation been disclosed. *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

Furthermore, Dr. Kessler's statements as alleged in the Christie affidavit are similar enough to statements that were already used to impeach him at trial. As stated above, Dr. Kessler conveyed in his trial testimony that an injury to the vertebral artery can be caused by one minor blow. This statement mirrors the statements that Ms. Christie purports to have heard during Dr. Kessler's conference presentation. At trial, defense counsel also read to the jury Dr. Kessler's grand jury testimony that Costin's fatal injury to the vertebral artery "could have been sustained from one punch in a certain way." Thus, there was nothing stated in Ms. Christie's affidavit, or in the abstract, that the jury was deprived of considering. *Cf. Conley v. United States,* 415 F.3d 183, 189 (1st Cir.2005) ("Suppressed impeachment evidence, if cumulative of *similar* impeachment evidence used at trial (or available to the petitioner but not used) is superfluous and therefore has little, if any, probative value.") (emphasis added).

## V. CONCLUSION

The Massachusetts Appeals Court reasonably applied the *Brady* standard to the facts of this case when it ruled that Dr. Kessler's abstract was not impeaching or exculpatory evidence. After reviewing the delayed and withheld evidence in its entirety, this Court holds that Dr. Kessler's statements were not inconsistent with his trial testimony that "multiple blows" and "substantial force" were inflicted upon Costin. As the Commonwealth's suppression of this evidence did not violate Junta's rights guaranteed by the Due Process Clause of the Fourteenth Amendment, his petition for a writ of habeas corpus must be, and hereby is, DENIED.

SO ORDERED.